IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 19, 2002 Session

## ALAN MILLER, ET AL. v. CITY OF MURFREESBORO, ET AL.

**Appeal from the Chancery Court for Rutherford County**
**No. 96-CV-975     John W. Rollins, Chancellor**

_____

**No. M2001-01478-COA-R9-CV - Filed July 2, 2003**

_____

In this retaliatory demotion case, the City of Murfreesboro appeals the action of the trial court in denying a Motion for Summary Judgment as to all issues. We find no material evidence in the record to establish that the articulated reason for the demotion of these three police officers, all of whom are established by the record to be honest and competent officers, is pretextual. The judgment of the trial court is reversed, and summary judgment entered for Defendant as to all issues.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and ROBERT L. JONES, SP. J., joined.

Susan Emery McGannon, Murfreesboro, Tennessee, for the appellant, City of Murfreesboro.

Terry A. Fann, Murfreesboro, Tennessee, for the appellees, Alan Miller, Ken Roberts and John Singleton.

**OPINION**

In this case, three police officers employed by the police department of the City of Murfreesboro sued the City of Murfreesboro together with Roger G. Haley, City Manager, and Bill Jones, Commissioner of Police. They allege that, prior to July 1, 1996, they each held the position of City Detective in the Murfreesboro Police Department. On that day, pursuant to a reorganization plan adopted by the City, they were demoted to patrol officers without any loss of pay. They assert that their demotion violated their due process rights under both the Constitution of the United States and the Constitution of Tennessee and, further, that such action violated the Tennessee Human Rights Act as codified in Tennessee Code Annotated section 4-21-101to1004. They allege that such action was in retaliation for certain actions on their part in exposing the alleged shortcomings of a superior officer in the department and in testifying in support of a fellow officer in a prior lawsuit.

They also allege that the action involved age discrimination and constituted outrageous conduct. They sought compensatory and punitive damages together with injunctive relief.

On July 29, 2001, the trial court granted summary judgment on all issues regarding the individual Defendants, Roger G. Haley and Bill Jones, but denied summary judgment as to the City of Murfreesboro. Interlocutory appeal was granted to Defendant, City of Murfreesboro, and the case is now before the Court on the appeal by that Defendant from the action of the trial court in overruling the Motion for Summary Judgment on all issues.

Plaintiff, Allan Miller, was employed by Defendant City as an entry level patrol officer on June 3, 1983. He has been a police officer since that time, having been promoted in August 1985 to vice-narcotics investigator and in August 1991 to detective-investigator. He remained in that position until he was demoted without loss of income to patrol officer as a part of the July 1, 1996 reorganization of the Police Department. He was 45 years of age at the time this suit was filed.

Plaintiff, Ken Roberts, was employed by Defendant in its Police Department in April 1983. In May 1992, he was promoted to detective and remained in that capacity until he was demoted without loss of pay to patrol officer as a part of the reorganization of the Police Department on July 1, 1996. Plaintiff Roberts was 46 years of age at the time this suit was filed.

Plaintiff, John Singleton, was employed by the Murfreesboro Police Department on July 1, 1976. In 1982, he was promoted to narcotics investigator. On April 1, 1986, he was promoted to detective and, in 1992, promoted to detective sergeant. In 1994 he was promoted to detective Lieutenant and held that rank continuously until he was demoted without loss of pay to patrol officer as a part of the reorganization of the City Police Department effective July 1, 1996. Plaintiff Singleton was 48 years of age at the time this suit was filed.

It is undisputed in the record that all of the Plaintiff Officers were honest and competent police officers.

Roger Haley was, at all times material in this case, the duly appointed City Manager for the City of Murfreesboro. Bill Jones was, at all times material in this case, the duly appointed Safety/Police Commissioner for the City of Murfreesboro. William Glenn Chrisman was employed in December 1976 as a patrolman for the City of Murfreesboro Police Department. He was promoted to sergeant in 1986 and ultimately to captain prior to the July 1, 1996 reorganization. On that date, he was named Deputy Chief of Police.

Mickey McCullough was an employee of the Murfreesboro Police Department and, prior to the reorganization of July 1, 1996, was supervisor over the Vice section of the Investigations Department. In the reorganization of July 1, 1996, he was promoted to major and placed in charge of the Detective Division of the Investigative Department, holding that position until he resigned September 10, 1999 following violation by him of certain department policies.

It is at this point necessary to interrupt the chronology in order to point out a practical problem which permeates every facet of this case. The real issues before the Court are buried under an avalanche of irrelevance. When the reorganization plan of July 1, 1996 was implemented, Police Commissioner Jones, with the concurrence of City Manager Haley, promoted Lieutenant Mickey McCullough to the rank of major and placed him in charge of the Detective Division of Investigative Services. This action met with the strong disapproval of Plaintiffs, and the overwhelming volume of the record in this case is devoted to the good and bad of Mickey McCullough. However, the selection of Mickey McCullough to lead the Detective Division addresses itself solely to the City Manager and the Police Commissioner. As far as the Court is concerned, it does not matter whether Mickey McCullough is an administrative and investigative genius or the town clown. Plaintiff Singleton is subjected to four successive depositions, all exasperatingly repetitious and of very little assistance to the Court. We are treated to a history of McCullough's alleged use of marijuana while attending college, his use of the City drug fund to pay a $400 repair bill for a City automobile, his payment from the City drug fund of the bar bill at a nightclub following a celebration among officers of a court victory, and his general lack of experience in detective work. Whether McCullough is honest or dishonest - - competent or incompetent - - humble or arrogant - - qualified or unqualified - - are matters addressing themselves, not to the Court, but to the City Manager and the Police Commissioner who have the unqualified right to appoint him or not to appoint him.

One cannot read the depositions of Plaintiffs, and particularly the repeated depositions of Singleton, without feeling empathy for the veteran police detectives who believe themselves to have been mistreated by the implementation of the reorganization plan of July 1, 1996, and who, as a result, were expelled from the ranks of the Detective Division and returned, albeit without loss of pay, to the Patrol Division. They do not, however, have veto power over the decisions of the City Manager and the Police Commissioner, and the decision in this case must focus on the real issues relative to due process, the Tennessee Human Rights Act, retaliation and pretext.

For whatever reasons, Police Commissioner Bill Jones, in 1995, had concerns about devisivness and communications problems between the Detectives Division, the Vice Division and the Patrol Division. On February 17, 1995, he issued Directive no. 95-04 entitled Re-evaluation of Criminal Investigation Divisions Assignments Functions and Responsibilities. At that time, the Criminal Investigation Division was composed of Captain Mosby, Lieutenants Peel and Singleton, Sergeant Flagg and Detectives Alford, Wilson, Miller, Roberts, Cunningham and Guthrie. The Directive was extensive and involved many changes in procedure and work shifts within the Division. The Directive was received with skepticism and resentment within the Detective Division, particularly when the detectives believed, with some apparent justification, that the Directive, though emanating from the Police Commissioner, was in fact the handy work of Lieutenant Mickey McCullough in the Vice Division.

Following up this Directive, Commissioner Jones issued a Memorandum to division and shift commanders on February 28, 1995, providing, in part:

Effective March 1, 1995, the work schedule for Detectives, Vice and C.I.D. will reflect a change in assignments in terms of shift, hours and days off. These changes are the result of an overall review of our investigative sections in an effort to improve departmental efficiency and the level of service to the public. I realize that most people do not like change, but if we are to maintain our reputation as of one of the finest departments in the State of Tennessee, we must work together as a team and accept change when necessary for improvement in order to better our department and move forward.

These changes are being made on a trial basis, and should have some immediate and significant effects on our department operation.

The avowed purpose of this Memorandum was better use of resources, better service to the public and better support of the patrol division.

The tensions perceived by Commissioner Jones did not subside, and in the spring and summer of 1996, City Manager Roger Haley determined to implement a drastic reorganization of the Murfreesboro Police Department in a manner best articulated in his Affidavit in Support of the Motion for Summary Judgment.

4. It is my responsibility as City Manager to organize City departments, personnel, and other resources to best serve the public. For more than a year I was concerned that the police department was not functioning as effectively and efficiently as it could. I discussed the department in conversations with individuals, including Commissioner Bill Jones and ranking officers in the Police Department, and with individuals in the law enforcement community such as Sheriff Truman Jones. As a result, I believed that the City could better serve the public if officers were only used to perform police functions and if non-certified ("civilian") employees were used for other departmental needs. I also believed that there were problems between the detectives, patrol and vice units.

During this time, Commissioner Jones had also told me that he would be considering retirement in the future. He suggested that I promote Captain Chrisman to the position of Assistant Chief, when Assistant Chief Doyle O'Brien retired, with a view to his succeeding him. In April 1996, I asked Captain Chrisman to consider the allocation of resources within the department and to give me his ideas on how to improve it, including an organizational structure. I subsequently discussed the operations and organization of the Police Department with Police Commissioner Bill Jones, Captain Randy Garrett, and Lieutenant Mickey McCullough and directed them to develop a reorganization plan. As a result of this process, Commissioner Jones recommended a plan for reorganizing the Police Department to me. I then recommended its adoption to the Murfreesboro City Council.

5. The reorganization plan was based on the goals and objectives outlined in my June 18, 1996 letter to the Mayor and City Council, . . . . The goals and concepts

were established before decisions were made about the personnel changes necessary to accomplish them. I generally accepted the recommendations made to me by Commissioner Jones and Captain Chrisman about individual assignments.

6. The Charter of the City of Murfreesboro provides, and the practice of the City of Murfreesboro requires, that the City Manager assign the job duties of all employees and select or approve employees for promotion. In various City departments, including the Police Department, I have approved the use of written promotion policies but said policies are non-binding and can be changed by me. They are not part of the City Charter nor have they been adopted by City ordinance. I decided that it would be best to implement the entire Police Department reorganization plan at one time rather than to do so on a piecemeal basis. I also decided that it would be more effective and efficient for me to request personnel recommendations from the Police Department employees working with me on the reorganization plan than for these recommendations to evolve through the Department's usual promotion procedures. The procedures also would not have allowed for the initial hiring of an employee in a position of rank which I had decided to make. Accordingly, I determined that it was not in the interest of the City or the Police Department for the customary personnel procedures to be used due to the scope of the reorganization. I therefore asked the City Council to confirm my authority to temporarily suspend any City policies which might impact upon the reorganization provided that no employee was disciplined, terminated, or decreased in pay, which they did by adopting Resolution 96-R-18. After the reorganization was complete, and the temporary suspension of customary practices no longer necessary, the City Council adopted Resolution 96-R-28 reducing the period of suspension from October 1, 1996 to August 8, 1996, . . . . All usual and customary personnel policies of the City and the Police Department have been in full force and effect from and after that date.

What happened as a part of the reorganization plan that provided the catalyst for this lawsuit is best stated in the words of Deputy Chief Glenn Chrisman in his affidavit.

On April 17, 1996, City Manager Roger Haley asked me to meet with him. He told me he wanted my thoughts on the Murfreesboro Police Department. He told me to look at the structure of the department and to consider how best to make a good department a great department. He said he wanted my suggestions on an organizational structure which could improve performance and implement the ideas discussed as a result of a Charleston Police Department conference I attended. As he directed, I thereafter analyzed the department and, based on my education and experience, developed some thoughts and ideas on how to achieve his goal of a more efficient and proactive department.

After subsequent meetings with Mr. Haley and discussions of these thoughts, Mr. Haley held a meeting on June 3, 1996 with Commissioner Jones, Captain Randy

-5-

Garrett, Lieutenant Mickey McCullough, and me, and directed us to work together to develop a plan for reorganizing the Police Department.

In this process, the elements and principles of the reorganization plan were discussed well before any discussion of the specific assignments of individual employees, except that Mr. Haley made clear that he intended to promote me to a new position as Deputy Chief, and to promote Captain Garrett and Lieutenant McCullough to head the patrol and investigative divisions of the Department, respectively.

I believed that problems existed in the relationship of the Detective Division and the Patrol Division, and between the Detectives and Vice. Commissioner Jones had previously addressed these issues in February 1995. He had changed the hours the Detective Division worked and directed that they attend roll calls to better support and coordinate with Patrol. He had also had a meeting with Detective Division personnel and directed that a meeting be held between the Detective and Patrol supervisors. Despite these efforts, it was my opinion that problems remained and would continue without personnel changes.

I recommended that a Major head each of the divisions of the Department. The group working on the reorganization plan proceeded on that premise. As Mr. Haley had indicated that Mickey McCullough would be promoted to serve as the head of the Criminal Investigations Division, in evaluating whether to continue the assignment of specific personnel to the Criminal Investigations Division, I had to consider whether these individuals could and would work as a team under Mickey McCullough's leadership and direction. Because of the past working history of the Detective and Vice Sections, I did not consider this likely. After receiving input from Lieutenant McCullough, I recommended extensive reassignment of Detective section personnel to Commissioner Jones and Mr. Haley. This included recommending the reassignment of Plaintiffs Miller, Roberts, and Singleton. I believed that reassigning Detective section personnel was necessary to develop a management structure with subordinate staff in the Criminal Investigations Division that would be dedicated to a common goal of investigative excellence with a supportive and cooperative attitude towards other divisions of the department.

Commissioner Jones concurred in the recommendations of Captain Chrisman, stating in his Affidavit:

I adopted and endorsed Captain Chrisman's recommendation for reassignment of personnel from the Detective Division. I believed that establishing a smooth, harmonious, and professional relationship between the different sections of the department required extensive shuffling of personnel. I believed that the officers then assigned to the Detective Division would not function effectively and accept direction from Mickey McCullough, who would be in charge of the division. The personnel affected included Plaintiffs Miller, Roberts, and Singleton.

Thus it was that, after consultation with Commissioner Jones, Captain Chrisman, Lieutenant Mickey McCullough and others, the City Manager implemented the reorganization plan; prevailed upon the City Council to suspend any City policies which might impact the reorganization; promoted Mickey McCullough to Major and appointed him to head up the Detective Division; demoted[1] Detectives Cunningham, Wilson, Roberts, Miller, Alford, Singleton, and Peel to patrolmen; reassigned Sergeant Flagg to Operations; promoted fourteen patrolmen to detective; and made various other promotions and transfers within the Police Department.

The first issue on appeal is the assertion by Defendant that summary judgment should be granted on the "due process" claim. In support of their due process claims, Plaintiffs assert a property right in their positions as detectives that could not be taken from them by reassignment to a lower ranking position without a hearing. In support of this assertion, they claim that General Order no. 215 of the Murfreesboro Police Department, relative to promotions, and certain provisions of Defendants' Employee Handbook were effective to protect their property rights in their detective status. Defendant, on the other hand, claims that both General Order no. 215 and the Employee Handbook were revocable at will by the City Council and that Resolution 96-R-18 was specifically adopted by the City Council in order to suspend the Employee Handbook and the General Order and clear the way for the reorganization plan.

The charter of the City of Murfreesboro provides, in part:

> (b) The city council shall appoint or elect the city recorder, city treasurer, city manager, and city attorney, who shall serve for an indefinite period and at the will of the council, and who shall have such other qualifications as may be prescribed in this Charter. The city council shall appoint or elect the city judge for a definite or indefinite period. All other employees, unless otherwise expressly provided in this Charter shall be appointed by the city manager, shall serve for an indefinite time and may be removed by such city manager at any time; . . . .

The introductory paragraphs of the Employee Handbook provide:

> • Any agreement between the city and an employee which purports to create an employment contract of fixed duration or any other type of employment contract must be in writing and must be signed by the City Manager.
> • The City Manager and/or City Council reserve the right to unilaterally modify, delete or add to the personnel policies contained herein, at any time.
> • No statement in the Employee Handbook or any other document published by the city should be construed to grant any employee an employment contract of fixed duration nor should this or any other personnel manual or document be interpreted as making an implied or express contract of employment. This will serve

---

[1] Much controversy is reflected by the record over whether or not Plaintiffs and other detectives were "demoted" in the reorganization. They were.

notice to all employees that the employment relationship may be terminated by either the city or the employee at any time for any reason, subject to Section 36[2] of the Charter.

•	All sections contained herein, like all other personnel policies published by the city, are intended as general policy statements containing broad internal policy guidelines and not as a contact or any other commitment.

General Order no. 215, dated April 1, 1996, was issued by Commissioner Jones relative to promotions within the police department. This General Order was never submitted to or adopted by the City Council nor approved by the City Manager.

Obviously, the drastic provisions of the reorganization plan, effective July 1, 1996, could not be implemented if the provisions of the Employee Handbook and General Order no. 215 were in effect. On June 20, 1996, the Murfreesboro City Council adopted Resolution 96-R-18 approving the reorganization of the Murfreesboro Police Department and providing:

> RESOLUTION 96-R-18, approving the reorganization of the Murfreesboro Police Department.
> WHEREAS, upon recommendation of the Commissioner of Police, the City Manager proposes a substantial reorganization of the Murfreesboro Police Department (MPD); and
> WHEREAS, among the goals and purposes of the reorganization is the placement of more department personnel in enforcement and fewer in administration for the better protection of the public; and
> WHEREAS, it is desirable to accomplish the reorganization as quickly and efficiently as possible with due consideration for the employees of the MPD and
> WHEREAS, in order to most efficiently accomplish the reorganization of the MPD, it appears necessary and desirable to suspend provisions of city personnel policies, including provisions of the Employee Handbook, job descriptions, and MPD General Orders that may conflict or impact the proposed reorganization; and
> WHEREAS, no employee is being terminated, disciplined, or receiving a salary decrease as a part of the proposed reorganization; and
> WHEREAS, the City Council desires to reaffirm and clarify the power and authority of the City Manager to administer the affairs of the City and to appoint all subordinate employees with regard to the proposed reorganization.
> NOW, THEREFORE, BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF MURFREESBORO, TENNESSEE, AS FOLLOWS:
> SECTION 1. City personnel policies, including but not limited to, any and all provisions of the Employee Handbook, MPD job descriptions, and MPD General Orders, including No. 215, "Promotions," that conflict with the reorganization of the MPD, are hereby suspended in order to most efficiently achieve a reorganization of

---

[2] Section 36 of the City Charter deals with the establishment of a disciplinary board and disciplinary procedure.

the MPD involving numerous transfers and reclassifications of employees and shall not apply to such reorganization.

      <u>SECTION 2</u>. No employee shall be disciplined or terminated as a part of the proposed reorganization. No employee shall be reclassified with a decrease in pay from the pay that the individual employee was receiving on the date of this resolution. Some employees may receive an increase in pay over the amount of pay the individual employee was receiving on the date of this Resolution. Any employee of the MPD is subject to reclassification with a change, reduction, or increase in rank and/or responsibilities as part of the reorganization.

      <u>SECTION 3</u>. Unless extended by further action of the City Council, the suspension established herein shall extend until October 1, 1996, and the Commissioner of Police and the City Manager shall endeavor to establish by that date such new job descriptions and other policies as may be necessary to be consistent with the reorganization of the MPD. In order that no employee shall be reduced in pay by the MPD reorganization, employees may continue to receive a salary in excess of that authorized for the rank and step to which they are reassigned indefinitely.

      <u>SECTION 4</u>. That this Resolution shall be effective immediately upon its passage and adoption, the public welfare and the welfare of the City requiring it.

As under the City Charter, all police officers were employees for an indefinite term. They were all employees at will. Under the same provision of the Charter, the City Manager has the unfettered power to hire and fire and to promote and demote all employees of the Police Department. Unless the Employee Handbook and General Order no. 215 are effective to inhibit such power, police officers have no property right in a specific position within the Department. Thus, if Resolution 96-R-18 is effective to suspend the provisions of the Employee Handbook and General Order no. 215, there is nothing to prevent the City Manager from imposing the reorganization plan and, in furtherance thereof, promoting and demoting employees at his discretion. Resolution 96-R-18 acknowledges that no employee is "being terminated, disciplined, or receiving a salary decrease as a part of the proposed reorganization."

Given the specific language of the Employee Handbook and the limited effect of General Order no. 215, Resolution 96-R-18 is a valid exercise of authority by the Murfreesboro City Council. It results that:

    1. Plaintiffs, being employed for an indefinite term, are employees at will. *Bringle v. Methodist Hosp.*, 701 S.W.2d 622 (Tenn. Ct. App. 1985).

    2. Neither the Employee Handbook nor General Order no. 215 constitute a part of the employment contract between the City of Murfreesboro and its police officers. *Rose v. Tipton County Pub. Works Dept.*, 953 S.W.2d 690 (Tenn. Ct. App. 1997).

    3. Appellants have no protected property interest such as would require due process considerations. *Bishop v. Wood*, 426 U.S. 341 (1976).

Defendants next assert that they are entitled to summary judgment on Plaintiffs' Tennessee Human Rights Act retaliation claim because Plaintiffs have insufficient proof of causation. The

Tennessee Human Rights Act (hereinafter 'THRA'), in part, prohibits employers from retaliating against an employee who "has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing." Tenn. Code Ann. § 4-21-301(1)(1991). THRA runs, essentially, a parallel course with Title VII, 42 U.S.C.A. § 2000e-3(a).

> Whether a retaliatory discharge claim is brought pursuant to the provisions of THRA or Title VII, a plaintiff must prove the same four elements: (1) that the plaintiff engaged in an activity protected by the statute; (2) that the defendant had knowledge of the plaintiff's exercise of protected activity; (3) that the defendant thereafter took an employment action adverse to the plaintiff; and (4) that a causal connection existed between the protected activity and the adverse employment action. *Newsom v. Textron Aerostructures*, 924 S.W.2d 87, 96 (Tenn. App. 1995).

*Austin v. Shelby County Gov't*, 3 S.W.3d 474, 480 (Tenn. Ct. App. 1999).

The bases of the THRA Complaint involves a fellow police officer, Kelvin Martin, who, in 1994, had filed a racial discrimination lawsuit against the City of Murfreesboro. *Martin v. Jones*, no. 94CV-1260, Rutherford County Ch. Ct., Murfreesboro, Tenn. All three Plaintiffs strongly supported Officer Martin in this case, and Plaintiffs Singleton and Miller testified in his support. Mickey McCullough, then a lieutenant in charge of the Vice Division, led the investigation of Officer Martin. Plaintiff Roberts summed up the situation when he testified in deposition: "I think we were united in our opinion that Mickey McCullough was on a witch hunt, if you will, of Kelvin Martin, that it was condoned by the leadership of the police department. . . . And I think it was pretty well a consensus opinion of the detective division that Mickey McCullough was out to get Kelvin one way or another."

There is no direct evidence in the record that the July 1, 1996 reorganization of the Murfreesboro Police Department, with its multitude of transfers, demotions and promotions, was in any way causally related to the Kelvin Martin case or that the decisions of the City Council or the City Manager were motivated by retaliation when they adopted and implemented the reorganization. As in *Austin v. Shelby County Government*, it takes imaginative stretching to find THRA causation in this case. However, since there is a more compelling reason for granting summary judgment in this case we will assume causation sufficient to withstand summary judgment and move on to the decisive issue.

The next issue: "Is Defendant entitled to a summary judgment on Plaintiffs' THRA retaliation and age discrimination claims because Defendant has established a legitimate and nondiscriminatory reason for its employment decision and Plaintiffs have failed to provide evidence from which a reasonable person could conclude that this reason was pretextual?"

In retaliatory discharge cases, the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) is applicable. This burden-shifting analysis is: "Once the plaintiff proves his prima facie case, the burden shifts to the employer to 'articulate some legitimate non-

discriminatory reason for the employee's discharge., . . . If the employer meets the burden of articulation, then the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reason proffered by the employer was not its true reason but merely a pretext for discrimination." *Moore v. Nashville Elec. Power Bd.*, 72 S.W.3d 643, 652 (Tenn. Ct. App. 2001) (quoting *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1329-30 (6th Cir. 1994)).

Assuming causation, the burden then shifts to the City of Murfreesboro to come forward and "articulate some legitimate non-discriminatory reason for the employee's discharge." The reason articulated by Defendant, as stated in the Affidavit of Deputy Chief Glenn Chrisman, is:

> As Mr. Haley had indicated that Mickey McCullough would be promoted to serve as the head of the Criminal Investigations Division, in evaluating whether to continue the assignment of specific personnel to the Criminal Investigations Division, I had to consider whether these individuals could and would work as a team under Mickey McCullough's leadership and direction. Because of the past working history of the Detective and Vice Sections, I did not consider this likely.

Defendants have met their burden of articulation, and the burden then shifts back to Plaintiffs to establish that the articulated reason was pretextual.

The determinative question on summary judgment is whether or not material evidence is presented from which reasonable minds could find that the reason articulated by Defendants is pretextual. The record does not contain such evidence.

As a backdrop to the consideration of this issue, it is necessary to acknowledge that the voluminous record in this case paints an unflattering picture of Major Mickey McCullough. It is not a balanced picture, as nobody undertook to articulate his good qualities. In the context of this case, it was not necessary to articulate to the court any good qualities of Mickey McCullough, since his appointment to head the Detective Division of the Murfreesboro Police Department in no way addresses itself to the Court but lies entirely in the discretion of the City Manager. As a consequence we are left with a record that would cause one to question the wisdom of such selection, but in the context of this case, it is not the prerogative of the Court to question the judgment of the City Manager. Statutes prohibiting discrimination are not vehicles for second-guessing employment decisions, nor are they intended to transform the court into personnel managers. A case cannot be sent to the jury simply because the court thinks the City Manager might have made an unwise business decision. *See Bienkowski v. Am. Airlines*, 851 F.2d 1503, 1507-08 (5th Cir. 1988); *Devore v. Deloitte & Touche*, No. 01A01-9602-CH-00073, 1998 WL 68985 (Tenn. Ct. App. Feb. 20, 1998).

Defendants assert that the reason Plaintiffs were transferred from the Detective Division is a firmly held belief that Plaintiffs could not effectively work under the supervision of Mickey McCullough. No reasonable person considering this record could say otherwise. Whether justified or unjustified, all three Plaintiffs detest Mickey McCullough and have had no respect for him since well before the July 1, 1996 reorganization. Plaintiff Miller testified in deposition:

Q.          Would you agree with me that there was a negative opinion of Mickey McCullough held by personnel in the detectives division before the Kelvin Martin investigation began?

A.          I would have to say that there was a negative opinion of Mickey McCullough prior to that.  Yes.

Q.          Would you say that the negative opinion held by the personnel in the detectives division of Mickey McCullough was generally or widely known through the police department prior to the Kelvin Martin investigation?

A.          Probably.

Q.          Do you know of any other officer or employee of the Murfreesboro Police Department about whom such general and widespread negative opinion was held by the personnel in the detectives division?

A.          You are asking me do I know of another person whose character was questioned as much as Mickey McCullough's?

Q.          Yeah.  Prior to reorganization was there a negative opinion about anyone else to the same extent that there was about Mickey McCullough by the detectives division personnel?

A.          I would say no.

                    . . . .

Q.          In that line of questioning, Mr. Miller, do you believe that it was in the best interests of the City of Murfreesboro that Mickey McCullough be promoted from lieutenant to major of the criminal investigations division in the reorganization?

A.          No.  I do not.

Q.          One of the previous deposition testimonies in someone's opinion - - I can't recall whose - - indicated that they believed that Commissioner Jones had been, to quote the testimony, sold a bill of goods regarding Major McCullough.

A.          Yes.

Q.          Do you understand that concept?

A.          Yes, I do.

Q.          Do you believe that to be true also?

A.          I think so.  Yes, sir.  I think Mickey McCullough did a great deal to mislead Commissioner Jones and to provide him with information that wasn't correct and true.  Yes.  I believe that.

Q.          You understand that the City of Murfreesboro suspended the personnel rules so that this reorganization could occur quickly and be in effect July 1, 1996; is that right?

A.          Yes, I do.

Q.          Do you agree that the suspension of the rules helped some persons and hurt other persons?

A.          It certainly did.

Q. It helped those persons that were getting promotions and denied due process to those that were not?

A. Yes, sir. That's the way I feel.

Q. Do you know how the City Manager and Police Commissioner could believe it is in the best interests of the City to promote Lieutenant McCullough to the rank of major, place him in charge as a commander of the entire criminal investigations unit when he has violated numerous City policies?

A. I could not comprehend why anyone would do that including Commissioner Jones and City Manager Haley.

Q. And not only violating numerous city policies but also violating the code of ethics of a police officer and violating Murfreesboro Police Department policies?

A. Yes, sir. I feel that he has violated that, and I cannot - - it troubles me that he is a department head and that he is a major and has been promoted to that position.

Q. Can you understand, Mr. Miller, how it could be in the best interests of the City to have a wholesale demotion of detectives with generally those persons having over 20 years of experience in law enforcement?

A. I cannot understand that and feel it would be adverse to the City not productive or good for the City.

Plaintiff Ken Roberts, in deposition, testified relative to the February 1995 directive:

And I wasn't in the meeting, but Mark said the Commissioner wasn't too happy with the way the meeting went. And it was a short period after that, we got the directive.

Q. Was the timing the only reason for your reaching that conclusion?

A. Well, it wasn't confirmed with the Commissioner from my point of view, the timing and the ambitiousness of Mickey McCullough's desire to take over. I think he was using the Commissioner to obtain what he wanted, his ambitions.

Q. Do you recall if there was discussion or a common belief by personnel in the detective's division that the directive had anything to do with Mark Wilson's activities on behalf of the FOP?

A. I think it had something to do with the meeting he had with the Commissioner. The overall thing was that - -

Q. Let me clarify. You spoke in response to my preceding question about your discussion with Mark Wilson on this topic. I was trying to find out whether you knew if other persons held that belief other than the two of you.

A. I think it was pretty much common belief among all of the detectives at that time that it had something to do with it.

It wasn't the only reason, but I think Mark's activities as FOP president was - - I don't think the Commissioner liked it. And it was an opportunity to - - the directive was an opportunity for him to show us that and also an opportunity

-13-

for Mickey McCullough to take over some control of the detective division and also show the Commissioner that he could do it. That's already been testified by several people.

Q. And to try and summarize that, is it accurate to state that you and other members of the detectives division believed the February 1995 directive was wrong in its conclusions and wrong in originating with Mickey McCullough?

A. I haven't read the directive, so I'm going on memory on its conclusions. It was wrong in originating with Mickey McCullough, definitely was wrong. It should have originated with the head of the detectives.

If there was changes in the detective division, it should have been through him. It came from a subordinate of his that had an ambition to take over the detective division. His motives were wrong, and the directive was wrong.

It didn't increase productivity. It didn't increase anything that we did in the detective division. It was a hindrance, and it was done in order to make us fail.

Q. It is fair to say that it was a widely held and widely discussed belief that Mickey McCullough did not have the knowledge to give direction to the detectives division?

A. Well - -

Q. As reflected in that direction?

A. As an investigator, he didn't have the knowledge or the experience. He didn't have the expertise.

Q. And are you agreeing with me that that opinion was shared and discussed by the personnel in the detectives division at the time the directive was issued?

A. Yes.

Q. Do you believe that commonly held opinion of Mickey McCullough was known to other personnel outside the detectives division within the Police Department?

A. Do I know if it was known?

Q. If you believe that other persons outside the detectives division knew what the detectives division thought of Mickey McCullough.

A. I'm sure some people did.

Q. Do you think Randy Garrett did?

A. He was probably told. Probably several people did.

Q. Do you think Mickey McCullough did?

A. I'm sure he knew what we thought of him.

Q. Do you think Glen Chrisman knew?

A. Glen was at the annex, and I'm not sure if he knew or not. He probably heard.

Q. Do you think Bill Jones knew?

A. What we thought of Mickey?

Q. Yes, sir.

A.          I'm sure he did . I say I'm sure. I mean, my opinion is - - he's never told me that he knew. There's so many people that tell things. I'm sure he knew.

Q.          And part of that commonly held and expressed opinion was that the people in the detectives division didn't trust Mickey McCullough, wasn't it?

A.          We didn't trust him especially after the directive. If we had any trust, it dissipated when he issued the directive for us.

The widespread dislike of Mickey McCullough within the detective division long pre-dated the July 1, 1996 reorganization and dated back to the time that Lieutenant Mickey McCullough took command of the vice unit in 1993 or 1994. Plaintiff Singleton testified in deposition:

Q.          Okay. But it is your testimony that the problems in communication and otherwise between detectives and vice began when Mickey McCullough took command of the vice unit?

A.          Yes, ma'am. That's a fair statement.

Q.          All right. Do you remember when that was?

A.          Right after I left. I don't know the year. Probably '94 maybe, '93.

Q.          So those problems began and were not in any way related to the Kelvin Martin case, were they?

A.          I never drew any distinction between Kelvin Martin and the lack of cooperation if you will.

Q.          Okay. So you don't think there was a relationship between the investigation and the problems between the two sections of the police department?

A.          I think the former detectives had their own opinion about the Kelvin Martin case, but still we tried to work with them.

Q.          Okay. But in terms of the order in which things happened, you are telling me that there were problems because Mickey McCullough took command of the vice unit. And he took command of the vice unit before the Kelvin Martin problems or investigation led to expression of opinion by the detectives, aren't you?

A.          Yes, ma'am. Yes, ma'am.

Q.          And did you ever express your opinion to Mickey McCullough before the February of '95 directive about how he was leading the vice unit?

A.          No, ma'am.

Q.          Did you ever express it to him after that time?

A.          No, ma'am.

Q.          Would you agree with Eddie Peel's statement that you didn't care for Mickey McCullough and that you had a negative opinion of him?

A.          Yes, ma'am.

Q.          Would you agree that your negative opinion of Mickey McCullough was generally known in the detectives division?

A.          Yes, ma'am.

Q.          Would you agree that everyone in the detectives division had a negative opinion about Mickey McCullough?

A.             No, ma'am.

Q.             Who do you believe in the detectives division did not have a negative opinion of Mickey McCullough?

A.             I didn't stand around and talk to the other detectives about Mickey McCullough as a general topic of conversation. But, you know, I never heard anybody say anything really good about Mickey. That's what I was trying - - I'm sorry it's taking me so long. I'm trying to reflect.

Q.             Well, take the time you need to be sure of your answers.

A.             But, come to think about it, every time Mickey's name came up, it was always in a negative form. So, I guess, to answer your question, I don't know of anybody that didn't express - - whether they meant it or that's the way they felt or they were going along with the rest of the opinions if you will.

Q.             Would you agree that the negative opinions generally held by personnel in the detectives division were known by persons in the police department outside the detectives division?

A.             In any unit that you're with with the police department, if there's conversation in one unit, then you might as well go ahead and put it in the newspaper. I'd say yes. I think I'd have to say yes to that.

These excerpts from the testimony of Plaintiffs indicate to any reasonable person that they could not serve in a subordinate position to Major Mickey McCullough.

Because this voluminous testimonial record reeks with the emotion and deep seated personal animosity of Plaintiffs for Major Mickey McCullough, we wish to make it clear that the Court is not taking sides in a controversy between Mickey McCullough and Plaintiffs. The Court did not appoint Mickey McCullough to lead the Detective Division. The Court has neither the authority nor the inclination to second-guess the City Manager in his selection of McCullough and, in fairness to him, the record before the Court does not purport to contain a balanced account of Mickey McCullough or the basis upon which the City Manager made his decision. He does not have to justify his decision to the Court any more than he has to justify the decision to Plaintiffs.

The City Manager transferred and demoted Plaintiffs because he did not believe they could work cohesively under the supervision of Mickey McCullough. Their own testimony, their protestations to the contrary notwithstanding, shows that the City Manager is correct. There is no evidence in the record to the contrary. The subjective interpretation by Plaintiffs of the City Manager's action does not create an issue of fact sufficient to defeat a properly supported summary judgment motion. *Devore*, 1998 WL 68985. Plaintiffs simply cannot show that a reasonable jury could find by a preponderance of the evidence that Defendant's stated reasons for their transfer and demotion are pretextual. *Gribcheck v. Runyon*, 245 F.3d 547, 552 (6th Cir. 2001).

Allegations as to age discrimination fail for the same reason that the allegations of retaliation fail. A major reorganization of the entire Police Department occurred in which employees were

transferred, promoted, demoted, and additional hiring made.  No credible evidence appears in the record that age had anything to do with the actions of the City Manager.

The City Manager is answerable to the City Council.  The City Council is answerable to the electorate.  The remedy of Plaintiffs lies at the ballot box and not at the courthouse.

The judgment of the trial court is reversed and summary judgment granted to Defendant on all issues.

Costs are assessed to Appellees.


_____
WILLIAM B. CAIN, JUDGE