Yvonne **KINAMORE,** Plaintiff–
Appellant,

v.

**EPB ELECTRIC UTILITY** d/b/a Electric **Power Board of Chattanooga,**
Defendant–Appellee.

No. 02–5631.

United States Court of Appeals,
Sixth Circuit.

Feb. 9, 2004.

Before KEITH, MARTIN and SUTTON, Circuit Judges.

SUTTON, Circuit Judge.

Yvonne Kinamore challenges a district court judgment rejecting her race discrimination and retaliation claims against the Electric Power Board of the City of Chattanooga ("the Board"). A long-time employee of the Board. Kinamore alleges that she suffered a series of discriminatory and retaliatory incidents between 1996 and 2000 and that all of them stemmed from complaints she made to the Board about her work environment. The district court granted the Board's summary-judgment motion and Kinamore appealed. We affirm.

**I.**

Yvonne Kinamore, an African–American woman, first took a clerical position in the Board's Energy Utilization Department in March 1981. After working in various positions over the next fifteen years, she became an Assistant in the Power Sales Department of the Board's Marketing Division in 1996. In this new capacity. Kinamore alleges that a supervisor. Randy Jackson, asked her in August 1996 to change the figures on the monthly activities reports to make them "look better." Kinamore Dep., Dec. 1, 2001 at 9. Kinamore refused, then complained to Harold DePriest. the Board's Assistant General Manager, about the incident. He told her not to worry about it.

In September 1996, the Board transferred Kinamore to a new section, where she kept her title, retained the same pay and had the same job duties. After starting in this new position, however, the Board delegated the duty of preparing activity reports to a white female co-worker. In October 1996, Kinamore met with DePriest to complain about the transfer of this responsibility. Again, DePriest managed to allay her concerns.

Restructuring at the company continued, and the Board transferred Kinamore to newly-formed departments three times in the next three years. With each move, however, her job title, duties and pay remained the same.

In April 1999, the Board transferred Kinamore to the newly-developed Community Relations Section of the Energy Services Department, where she became a Community Relations representative. On June 17, 1999, Hosea Pierce, the Board's Supervisor of Community Relations, gave Kinamore a favorable annual performance evaluation, and she received a merit increase in pay as a result.

This positive beginning in Community Relations did not last long, either from Kinamore's perspective or the Board's. Later in the summer of 1999. Kinamore complained to Beth Jones, the Manager of the Energy Services Department, about Pierce's propensity for using profanity and smoking cigarettes in her presence. Although Jones assured her that she would speak to Pierce about this behavior, Kinamore alleges that the behavior continued in her presence and in the presence of her co-workers.

One duty of Community Relations employees was to decorate the Board's windows with Christmas displays during the holiday season. In January 2000, Rebecca Rollins, the Vice President of Customer Relations, asked Pierce to take the displays down, and he approached Kinamore and Jay Willard, a white male, to help him in the clean-up effort. The project lasted several days. At one point during this effort, Pierce found himself working alone while Willard was reading a newspaper and Kinamore was talking on the telephone. In response, Pierce asked Willard to move wood from the window displays to a storage area and asked Kinamore to collect and remove garbage from several of the displays. Characterizing the work as "menial." Kinamore Dep., Nov. 15, 2001 at 165, Kinamore refused to do it.

Soon after the incident, Kinamore and Willard received e-mail messages from Pierce—copied to Pierce's supervisor, Deanne Hawthorne—concerning their failure to help in cleaning up the holiday display. Kinamore responded with a memorandum to Hawthorne regarding the holiday displays and further complaints about Pierce. A few days later, she sent Hawthorne a second memorandum containing additional complaints about Pierce. Hawthorne investigated the matter and issued a counseling statement to Kinamore

addressing her refusal to complete the job assignment and her Pierce-related complaints. The same day, Hawthorne issued a counseling statement to Willard for failing to tell Pierce where he was and for failing to help with the clean-up effort. Pierce, too, received a counseling statement for threatening employment action against Willard and Kinamore without prior supervisory approval.

In response to the counseling statement, Kinamore denied any insubordination. She stated that she was acting within the Board's sexual harassment policy and that the matter was "clearly about racial intimidation, sexual discrimination, and retaliation." Kinamore Memo, to Hawthorne at 3. Terry Ramsey, the Board's Human Resources Manager, later met with Kinamore to discuss her concerns. According to Ramsey, Kinamore did not discuss racial discrimination in her meeting with Ramsey, and each of them determined that Pierce's profanity and smoking did not constitute sexual harassment.

In the spring of 2000, Kinamore and Jerry Draper, a white male co-worker, were sent to cross-train at the Information Desk of the Customer Contact Department to cover for two employees who had taken leave after deaths in their families. Both Kinamore and Draper returned to their regular duties when those employees returned to their jobs.

On May 5, 2000, Pierce gave Kinamore her annual performance evaluation, which included an overall rating of "needs improvement." Performance Appraisal at 5. The evaluation noted Kinamore's problems with attending to assignments thoroughly and with completing them in a timely fashion. It also noted Kinamore's need for improved communication with Pierce and her deteriorating performance during the year–following two counseling statements. Kinamore characterized the evaluation as

"defamation," "very humiliating" and "continued harassment" for her complaints about Pierce. Dist. Ct. Op. at 10. On June 9, 2000, she filed a charge of discrimination with the EEOC, asserting racial discrimination and retaliation.

On July 28, 2000, Community Relations hosted a local public relations event featuring "Louie the Lightning Bug," a costumed character used in the Board's public safety campaigns. Kinamore and Sophia Lansden, a temporary Community Relations employee, brought the costume to the event, and Lansden wore the costume during the event. At some point after the event, the Board's Vice President, Greg O'Haver, reviewed photographs of the event and noticed scratches on the costume's eyes. He asked Pierce to determine who was responsible for the damage. Pierce first interviewed Lansden, who said that Kinamore had caused the scratches by dragging the costume on the ground while transporting it to the event. Lansden also noted that Kinamore had acknowledged the scratches and had planned to try to clean them off. Pierce next interviewed Kinamore, who denied dragging the costume. Pierce ultimately concluded that Kinamore was responsible for the costume damage and reported his conclusion to O'Haver. Relying on this report as well as conversations with Ramsey and DePriest, O'Haver chose to suspend Kinamore for three days.

After serving the suspension, Kinamore spent four months on medical, family and extended leave. She then filed this lawsuit in federal district court and resigned from the company. The complaint alleged (1) race discrimination and retaliation under Title VII (42 U.S.C. § 2000e), 42 U.S.C. § 1981 and the Tennessee Human Rights Act (Tenn.Code Ann. § 4–21–101, et seq.), and (2) retaliatory discharge under the Tennessee Public Protection Act (Tenn. Code Ann. § 50–1–304) and Tennessee common law. The Board moved for summary judgment.

In granting the Board's motion, the district court concluded that several of Kinamore's allegations were barred by the 300–day statute of limitations applicable to claims under Title VII as well as the one-year statute of limitations applicable to claims under the Tennessee Human Rights Act (Tenn.Code Ann. § 4–21–311(d)) and 42 U.S.C. § 1981 (*see Jackson v. Richards Medical Co.,* 961 F.2d 575, 578 (6th Cir. 1992); Tenn.Code Ann. § 28–3–104). Because Kinamore complained of discrete and isolated acts by the Board, the court concluded that there was no continuing violation of her civil rights and that these statutes of limitations applied. In reviewing her claims, as a result, the court considered only Kinamore's allegations that occurred within the limitations period. In the end, the court concluded that she had not established a prima facie case with respect to any of her claims.

On appeal, Kinamore first challenges the court's conclusion that her retaliation, constructive-discharge and retaliatory-discharge claims fail as a matter of law. She then argues that the district court erred in failing to consider discriminatory incidents that occurred before the limitations period in making these decisions. Kinamore has not challenged the dismissal of her race-discrimination claim.

## II.

The customary rules for reviewing a summary-judgment decision apply. We give de novo review to the district court's decision. *Sperle v. Mich. Dep't of Corr.,* 297 F.3d 483, 490 (6th Cir.2002). A decision granting summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.

R.Civ.P. 56(c). And in considering such motions, we give all reasonable factual inferences to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## A. Retaliation

To establish a prima facie case of retaliation under Title VII, Kinamore must show that: (1) she engaged in protected activity; (2) the relevant decisionmakers of the Board knew about this protected activity; (3) the Board took adverse employment action against her; and (4) a causal connection exists between her protected activity and the adverse employment action. *Weigel v. Baptist Hosp.,* 302 F.3d 367, 381 (6th Cir.2002). An adverse employment action, we have said, involves "significantly diminished material responsibilities," including "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Kocsis v. Multi–Care Mgmt.,* 97 F.3d 876, 886 (6th Cir.1996).

In the event Kinamore proves the elements of a prima facie case, "the burden [of production] shifts to [the Board] to articulate a legitimate, non-discriminatory reason for the adverse action." *Nguyen v. City of Cleveland,* 229 F.3d 559, 562 (6th Cir.2000). If the Board in turn meets this burden, Kinamore must demonstrate by a preponderance of the evidence that the proffered reason was merely a pretext for discrimination, which is to say the Board's reason (1) had no basis in fact, (2) did not actually motivate the adverse action, or (3) was insufficient to motivate the adverse action. *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir.

1994). If Kinamore shows that the Board's proffered, non-discriminatory reason was pretextual, unlawful retaliation may be inferred and she would be entitled to take her claim to a jury. *See Kline v. Tenn. Valley Auth.,* 128 F.3d 337, 344 (6th Cir.1997). Tennessee law in each of these respects is similar. *See Miller v. City of Murfeesboro,* 122 S.W.3d 766 (Tenn.App. 2003); *Austin v. Shelby County Gov't,* 3 S.W.3d 474, 480 (Tenn.Ct.App.1999).

Kinamore claims that the Board engaged in five acts of retaliation against her within the limitations period. We consider each claim in turn.

### 1. Supervisor Profanity and Smoking.

■ Kinamore first points to the behavior of her supervisor, Pierce, namely, his smoking and use of profanity in the presence of those he supervised. But this behavior, unpleasant though it may have been, did not rise to the level of an adverse employment action against Kinamore because it did not affect her responsibilities, wages, title or benefits. And because all employees in her department were exposed to Pierce's actions, as she acknowledges, Kinamore cannot show a causal connection between the conduct and her protected activity.

### 2. Menial Tasks.

■ Kinamore next points to the fact that the Board asked her to work on the clean-up crew for the Board's Christmas window displays, a task that she describes as "menial" and that the Board imposed upon her (she alleges) in view of her protected activity. This clean-up responsibility also fails to rise to the level of an adverse employment action. It was a seasonal task, it was by definition a temporary job assignment, and it accordingly cannot fairly be described as "significantly

diminished material responsibilities," *Kocsis,* 97 F.3d at 886, particularly in view of the undisputed fact that her *supervisor* took part in the assignment as well. Nor has Kinamore tenably shown a causal connection between the assignment and her complaints. Pierce not only asked another Customer Relations employee to assist in the project but, again, he also handled much of the work himself. When Kinamore and Willard, a white male co-worker, failed to do all that they were asked, Pierce gave *both of them* counseling statements, consistent with the Board's disciplinary policy. Kinamore has offered no reasoned explanation why any of these actions establish a cognizable claim of retaliation.

### 3. Reassignment.

■ Kinamore next contends that her assignment to cross-train at the Customer Information Center in the spring of 2000 was an adverse job change—particularly when considered with the transfers that had already occurred—and resulted from her protected activity. Far from suffering under this new assignment, however, Kinamore described her work as "exceptional" and said that her "experience was remarkable." Kinamore Memo, to Pierce at 3.

The undisputed structural changes at the Board that prompted this cross-training and Kinamore's previous transfers also do not square with a claim of retaliation. From 1996 onward, the Marketing Department underwent significant restructuring, which led to the merging of whole departments, the termination of some employees and the transfers of many others. Indeed, Kinamore, Willard and Draper all were transferred to Community Relations in 1999, and Draper and Kinamore in the spring of 2000 were temporarily assigned to cross-train at the Customer Contact desk when it became understaffed after two employees took a leave of absence. Both Kinamore and Draper returned to Customer Relations when their training was complete. Nothing on this record indicates that the Board committed adverse employment actions against Kinamore in reassigning her (as well as the entire Marketing Department) during the restructuring and calling upon her (as well as another employee) to address a legitimate staffing shortage.

### 4. Negative Performance Evaluation.

■ Kinamore next claims that her unfavorable May 2000 evaluation was an act of retaliation. In making this argument, Kinamore first overlooks the fact that she received positive personnel evaluations from the same supervisor (Pierce) in each of the two previous years. She then overlooks the fact that Pierce gave concrete reasons for this evaluation, which she has not been able to contradict. During the period covered by the evaluation, for example, Pierce noted that Kinamore had frequently complained about her job assignments—sometimes refusing to perform them—and accordingly had received counseling statements from Pierce and his supervisor, Hawthorne. Other than the bare assertion that the evaluation was retaliatory, Kinamore offers no explanation why and no argument why she was treated more stringently than any other employee. Nor has Kinamore offered any explanation why a negative employment review by itself constitutes an adverse employment action under *Kocsis.* At all events, the Board gave legitimate reasons for the evaluation, and Kinamore has not offered any sustainable argument that these reasons were pretextual.

### 5. Suspension.

■ Kinamore next claims that her three-day suspension in August 2000 was

an act of retaliation. The Board, however, imposed the suspension only after an investigation revealed that Kinamore was responsible for more than $1,200 worth of damage to the "Louie the Lightning Bug" costume. Even if we accept Kinamore's position that a three-day suspension without pay qualifies as an adverse employment action under *Koscis*, Kinamore has not shown that the non-discriminatory reasons given by the Board for her suspension—an investigation revealing that she was responsible for the costume's damage—were pretextual.

After reviewing photographs of the Louie character at the public relations event and after noticing scratches on the costume's eyes, the Board's Vice President. O'Haver, asked Pierce to determine how the costume was damaged. Pierce discussed the incident with both Kinamore and Lansden. He then reported back to O'Haver the results of his investigation—namely, his finding that Kinamore caused the damage by dragging the costume along the ground. After consulting with Ramsey and DePriest, O'Haver made the decision to suspend Kinamore for three days without pay.

All that Kinamore offers in response to this explanation is her sentiment that the suspension was retaliatory. But an employee's subjective view about an employment action, without further evidentiary support, may not by itself establish that the decision was pretextual. *See Anthony v. BTR Auto. Sealing Sys.*, 339 F.3d 506, 516 (6th Cir.2003) (noting that employee must provide specific evidence to prove that an employer's reason for adverse employment action was not factually based or was not the real basis for the decision). Relying on Pierce's report and his own investigation. O'Haver believed that the costume incident "reflected carelessness by Ms. Kinamore for [Board] property,

and her failure to attempt to clean or otherwise repair the costume demonstrated a lack of concern. Furthermore, Ms. Kinamore's failure to report the damage suggested that she attempted to cover up her actions." O'Haver Aff. ¶ 6. When assessing an employer's adverse employment action, "the key inquiry is whether the employer made a reasonably informed and considered decision before taking [it]." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir.1998).

O'Haver satisfied this standard. At no point has Kinamore offered any explanation why O'Haver could not, fairly rely upon Pierce's investigation—and Lansden's first-hand observations—to draw the conclusion he did. Unable to establish pretext for O'Haver's suspension decision, this claim of retaliation fails as well.

## B. Constructive Discharge

■ Kinamore raises a separate constructive discharge claim, arguing that "[t]he cumulative effect of the harassment and retaliation created a hostile working environment, substantially altered the terms of [her] employment and resulted in a constructive discharge." Appellant's Br. at 27. To establish a prima facie claim in this area. Kinamore must show that the Board (1) "deliberately created intolerable working conditions, as perceived by a reasonable person." and (2) did so "with the intention of forcing [her] to quit [working there]." *Logan v. Denny's, Inc.*, 259 F.3d 558, 568–69 (6th Cir.2001). As we have said:

A finding of constructive discharge in this circuit requires an inquiry into both the objective feelings of an employee, and the intent of the employer. A constructive discharge exists if "working conditions would have been so difficult or unpleasant that a reasonable person

in the employee's shoes would have felt compelled to resign." *Yates v. Avco Corp.*, 819 F.2d 630, 636–37 (6th Cir.1987) (quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.1982)). Factors to consider in evaluating whether such "conditions" exist include the presence of the following: (1) a demotion; (2) reduced salary; (3) reduced job responsibilities; (4) a reassignment to menial or degrading work; (5) a reassignment to work under a younger supervisor; (6) badgering, harassment or humiliation by the employer designed to encourage the employee's resignation; and (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Logan*, 259 F.3d at 569.

None of the challenged actions—the same ones that Kinamore challenged as retaliatory—rises to this level of severity. Neither Pierce's behavior (smoking and cursing) nor the holiday display clean-up task can fairly be called intolerable working conditions. Indeed, they do not tenably contain any of the *Logan* factors. Nor does Kinamore's cross-training assignment qualify. She was asked to staff a different desk due to a short-term staffing emergency and later admitted to having a positive experience while there—again failing to implicate any of the *Logan* factors.

Kinamore's constructive discharge claim also fails because she has not shown that the Board's actions were intended to force her to quit. While "[i]ntent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions," *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir.1999), Kinamore has shown no such thing. She received a negative performance evaluation at the end of a year in which she frequently complained about job assignments, even refusing to complete one—an action for which she received two counseling statements in accordance with the Board's disciplinary policy. It is not readily apparent how a job evaluation that her work "needs improvement" reflected the Board's general intention to force her resignation or that her resignation was a foreseeable consequence of the assessment. Kinamore after all was not demoted; she did not receive a salary reduction; and her title never changed.

Nor did the three-day suspension indicate that the Board sought to compel her resignation. Pierce's investigation established that Kinamore was at fault for damaging the Board's "Louie the Lightning Bug" costume and the Board's resulting disciplinary action was well within the range of reasonable responses to the incident. Once she served the suspension, Kinamore in fact returned to work for three days before commencing her extended leave, and four months passed before she resigned from the Board. The district court on this record concluded that Kinamore did not establish a prima facie case for constructive discharge. We agree.

## C. Continuing Violation

Kinamore next argues that the district court erred in failing to recognize that she had been exposed to a "continuing violation" of her employment rights and thus erred in failing to consider several alleged retaliatory acts that occurred before the limitations period. Kinamore argues that the district court should have considered all of the Board's alleged misconduct against her, dating back to her first complaint to DePriest in 1996.

The district court determined that two "narrowly limited exceptions" exist to the customary rule that the statute of limitations period is triggered at the time each discriminatory act occurred. *See Haithcock v. Frank*, 958 F.2d 671, 677–78 (6th Cir.1992). One exception, it noted, applies

"where there is some evidence of *present* discriminatory activity giving rise to a claim of a continuing violation; that is, where an employer continues presently to impose disparate work assignments or pay rates between similarly situated groups." *Dixon v. Anderson,* 928 F.2d 212, 216 (6th Cir.1991). The other exception, it noted, applies "where there has occurred a long-standing and demonstrable policy of discrimination.... Unrelated incidents of discrimination will not suffice to invoke this exception; rather there must be a continuing over-arching policy of discrimination." *Id.* at 217 (quotations omitted). Tennessee law, the district court finally noted, also recognizes this doctrine. *See Spicer v. Beaman Bottling Co.,* 937 S.W.2d 884, 889 (Tenn.1996).

In *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), which was decided after the district court's decision, the Supreme Court altered this doctrine. In the context of traditional employment discrimination claims, such as a retaliation claim like this one, it observed that an employment "practice" has been interpreted "to apply to a discrete act or occurrence, even when it has a connection to other acts." *Id.* at 111. "Discrete discriminatory acts." the Court continued, "are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113. As a result, "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.* at 114. By contrast, the Court reasoned, "hostile work environment claims are different in kind from discrete acts. Their nature involves repeated conduct." *Id.* at 115. Such a claim involves an "'[u]nlawful employment practice' ... [that] ... cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.*

In the aftermath of *Morgan,* we have concluded that the two-part inquiry for showing a continuing violation applies only to hostile work environment claims. *See Sharpe v. Cureton,* 319 F.3d 259, 268 (6th Cir.2003) ("Accordingly, *Morgan* overturns prior Sixth Circuit law addressing serial violations, *i.e.,* plaintiffs are now precluded from establishing a continuing violation exception by proof that the alleged acts of discrimination occurring prior to the limitations period are sufficiently related to those occurring within the limitations period."). With respect to run-of-the-mill retaliation claims, however, only the "second category of continuing violations, involving a longstanding and demonstrable policy of discrimination." may be used to avoid the customary rule that the limitations period begins to run with each discriminatory act. *Id.*

■ Perhaps as a result of *Morgan,* Kinamore argues that the court should treat the retaliation count in her complaint as being in the nature of a hostile work environment claim. We need not address whether this mode of argument is appropriate as it makes no difference to the outcome of this case. Under any of the standards that pre-date or post-date *Morgan,* Kinamore cannot show that the district court committed a prejudicial error with respect to the alleged instances of misconduct that it did, or did not, consider. Take the allegations of misconduct that occurred within the limitations period. Whether looked at together or singly, these five allegations—all discussed above—do not show present discriminatory activity or for that matter a longstand-

ing policy of retaliation or discrimination. As the district court correctly recognized, and as we have now confirmed, none of Kinamore's allegations establishes a cognizable case of either retaliation or constructive discharge.

Kinamore does no better in referring to alleged misconduct outside of the limitations period—primarily a series of job transfers that did not diminish her pay or responsibilities and a new work desk—and in claiming that these incidents in combination with later ones reveal a retaliatory hostile work environment. Whether looked at by themselves or in connection with the five allegations within the limitations period, these actions do not support a cognizable hostile work environment claim. From 1996 onward, the only time Kinamore can show that she was treated in a materially-different and materially-hostile way relative to other employees of the Board was when her conduct—e.g., the "Louie the Lightning Bug" costume incident and resulting three-day suspension—justified the Board's actions.

**D. State Retaliatory Discharge**

■ Kinamore also claims she was a victim of retaliatory discharge under Tennessee common law and the Tennessee Public Protection Act, Tenn.Code Ann. § 50–1–304, after alleging illegal activities to DePriest in 1996. To establish a prima facie case of retaliatory discharge under the Tennessee Public Protection Act, Kinamore must demonstrate: (1) her status as a Board employee: (2) her refusal to participate in, or remain silent about, illegal activity; (3) her discharge by the Board; and (4) an "exclusive" causal relationship between her refusal to participate in the illegal activities and her termination by the Board. *Griggs v. Coca–Cola,* 909 F.Supp. 1059, 1063 (E.D.Tenn.1995). To sustain a common law claim for retaliatory dis-

charge. Kinamore likewise must show that reporting illegal activities was a substantial factor in her discharge. *See Guy v. Omaha Ins. Co.,* 79 S.W.3d 528, 535 (Tenn.2002). Kinamore has not succeeded on either front.

Even if we accept as true Kinamore's allegation that she reported to DePriest that Jackson wanted her to make the reporting figures look better in 1996 (a claim DePriest denies), she has not demonstrated that the activity was illegal. The Tennessee Public Protection Act addresses illegal activities in "violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn.Code Ann. § 50–1–304(c). The reports to which Kinamore refers are internal Board documents relating to activities within her department that would not affect the standing of the Board's financial position or its employees; they thus do not implicate the Tennessee Public Protection Act.

As shown above, moreover. Kinamore resigned and was not terminated by the Board, Having failed to show any action severe enough to compel a reasonable person in her shoes to quit. Kinamore cannot establish the "exclusive causal relationship" between her report to DePriest and any actions taken by the Board.

Finally, even if Kinamore had presented a prima facie case for retaliatory discharge, the Board has countered with legitimate, non-discriminatory reasons for its actions against her and she has not shown that any of them are pretextual. *See Foster v. Colonial Dev. Inc.,* 2002 WL 185477 (Ten.Ct.App. Feb. 6, 2002) (noting that if there is proof of a causal link between refusal to participate in illegal activity and termination, the burden shifts to the defendant to show non-pretextual reasons for the discharge and, once that is

done, back to the plaintiff to show those reasons were non-legitimate). Therefore, her state law claim of retaliatory discharge fails.

### III.

For the foregoing reasons, we affirm.