Tammie C. ALLEN

v.

Sidney McPHEE et al.

Supreme Court of Tennessee,
at Nashville.

June 6, 2007 Session.

Dec. 4, 2007.

Steven E. Sager and L. Gilbert Anglin, Murfreesboro, Tennessee, for the appellant, Tammie C. Allen.

Barbara J. Moss and Lauren Paxton Roberts, Nashville, Tennessee, for the appellee, Sidney McPhee, in his individual capacity.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; William J. Marett, Jr., Sr. Counsel, Civil Litigation and State Services Division; for the appellees, State of Tennessee, Tennessee Board of Regents, Middle Tennessee State University, Charles Manning in his official capacity as Chancellor of the Tennessee Board of Regents, and Sidney McPhee in his official capacity as President of Middle Tennessee State University.

## OPINION

JANICE M. HOLDER, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and CORNELIA A. CLARK, and GARY R. WADE, JJ., joined.

The employee asserts that both her employer and supervisor are liable for retaliation and discrimination. The trial court granted summary judgment to the employer and supervisor on all issues, and the Court of Appeals affirmed. We granted review of this case to address the standards for imposing liability for sexual harassment discrimination and retaliation under the Tennessee Human Rights Act. With respect to the discrimination claim against the employer, we hold that the availability of the *Faragher/Ellerth* affirmative defense is not affected by the harassing supervisor's status as a "proxy" or "alter ego" of the employer. We conclude, however, that genuine issues of material fact exist regarding whether the employer has established the *Faragher/Ellerth* defense. Accordingly, the employer is not entitled to summary judgment on the employee's discrimination claim. With respect to the discrimination claim against the supervisor, we hold that to be individually liable for discrimination a supervisor must encourage the employer to engage in employment-related discrimination or prevent the employer from taking corrective action. The employee has failed to present any evidence that the supervisor encouraged the employer to engage in harassment or attempted to prevent the employer from taking corrective action. Accordingly, the supervisor is entitled to summary judgment on the employee's discrimination claim. With respect to the employee's retaliation claims, we hold that to state a prima facie case for retaliation an employee must demonstrate: 1) that she engaged in activity protected by the THRA; 2) that the exercise of her protected rights was known to the defendant; 3) that the defendant thereafter took a materially adverse action against her; and 4) there was a causal connection between the protected activity and the materially adverse action. If an employee establishes a prima facie case of retaliation, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the materially adverse action. If the defendant articulates such a reason, the employee, who bears the burden of persuasion throughout the process, must present evidence demonstrating that the articulated reason is pretextual. We conclude that the employee succeeded in making a prima facie showing with respect to the employer but has failed to present any evidence that the employer's stated reason for transferring the employee was pretextual. Accordingly, the employer is entitled to summary judgment on the employee's retaliation claim. Finally, we conclude that the employee has failed to present evidence demonstrating that the supervisor took an action materially adverse to the employee. Accordingly, the supervisor is entitled to summary judgment on the employee's retaliation claim. We there-

fore affirm the trial court's judgments with respect to the discrimination claim against the supervisor and the retaliation claims against the employer and supervisor. We reverse the trial court's grant of summary judgment on the discrimination claim against the employer and remand this case to the trial court for further proceedings.

The appellant, Tammie C. Allen ("Allen"), filed a complaint alleging unlawful gender-based discrimination in the form of a sexually hostile work environment and retaliation under the Tennessee Human Rights Act ("THRA"). Allen's complaint was filed against the appellees, Dr. Sidney McPhee ("McPhee"), Middle Tennessee State University ("MTSU"), the Tennessee Board of Regents ("TBR"), the Chancellor for the TBR, and the State of Tennessee. We begin our review by summarizing the detailed factual and procedural history.[1]

In September 1992, Allen was hired as a secretary at MTSU. By August 1999, she had been promoted to executive secretary in the president's office. She was later promoted to the position of administrative assistant in the president's office. In August 2001, McPhee was selected as the president of MTSU, and Allen began working as his administrative assistant.

On November 5, 2001, McPhee approved a revision of MTSU's policies and procedures regarding sexual and racial harassment. The revised policy was in effect at all times relevant to this proceeding. Among other things, the policy defines sexual harassment, subjects those who engage in harassing behavior to discipline, and outlines the complaint and investigation procedures to be followed if harassment occurs. Specifically, the policy provides that MTSU employees are required to report harassment to the Director of

Equal Opportunity and Affirmative Action ("the director"). After harassment is reported, the policy requires an investigator to investigate the allegations of harassment and determine whether the anti-harassment policy has been violated. When the investigation is complete, the investigator drafts a report summarizing the basis of the complaint, the findings of the investigator, and recommendations regarding the disposition of the complaint. The report is then presented to the president. The president is responsible for reviewing the report and making the final determination of the appropriate resolution of the complaint. The policy further states that "[t]o the extent possible, the investigation will be conducted in such a manner to protect the confidentiality of both parties."

In early August 2002, McPhee and Allen were playing golf when McPhee touched Allen and tried to kiss her. According to Allen, McPhee requested that she kiss him, but she turned her face away. McPhee then placed his hand under Allen's shirt and touched the side of her body. In addition, McPhee, while behind Allen, pressed his body against Allen while she was trying to hit a golf shot. Allen described McPhee's actions as "shocking" and "unwelcome." McPhee later telephoned her to apologize for his actions.

On August 26, 2002, McPhee and Allen were again playing golf when McPhee touched Allen. According to Allen, McPhee hugged her, rubbed her back and neck, and tried to kiss her. At one point, McPhee rubbed Allen's upper thigh, forcing Allen to use her hand to block any further movement. At another point,

---

1. Because this case was decided on a motion for summary judgment, we are required to view the proof in the light most favorable to

Allen, the non-moving party. *Godfrey v. Ruiz,* 90 S.W.3d 692, 695 (Tenn.2002). The factual history has been summarized accordingly.

McPhee placed his pelvic area against Allen while she was attempting a golf shot.

On October 2, 2002, McPhee asked Allen to participate in a golf tournament as part of a team representing MTSU. After the tournament, the two drove back to MTSU in McPhee's car. While driving, McPhee reached over and placed his hand on Allen's upper thigh. McPhee tried to move his hand through the leg openings of Allen's shorts. Allen tried to prevent McPhee from moving his hand, and after ten to fifteen seconds McPhee stopped.

On Saturday, February 15, 2003, McPhee called Allen and requested that she report to work, which she did. According to Allen, McPhee shut the door and asked her to dance with him. Although Allen complied, she felt "uncomfortable." During one of the dances, McPhee rubbed Allen's lower back and pressed his body against hers.

On Sunday, February 16, 2003, McPhee again called Allen and requested that she report to work. Allen tried to call a friend, Dr. Duane Stucky, to seek advice on how to "deal with the situation." She was unable to reach Dr. Stucky. After she arrived at work, McPhee began playing music and asked Allen to dance. At one point, McPhee pulled Allen's body against his. Allen told McPhee that the dancing was making her uncomfortable.

After Allen left the office, she spoke to Dr. Stucky about the incident but did not tell him all of the details of the harassment. Shortly thereafter, she spoke about the incident to Dr. Watson Hannah, the director of the Office of the Executive Vice President and Provost at MTSU. Sometime during the following weeks, Allen familiarized herself with MTSU's anti-harassment policy, which was available online. She did not, however, file a formal charge or complaint of harassment at this time. Allen claims her reluctance to file a

formal complaint was based on the fact that the policy dictated that McPhee would make the final decision concerning the resolution of the complaint.

In August 2003, McPhee asked Allen to play golf several times. Allen claims that on one occasion McPhee began asking her explicit questions about sexual intercourse and her sexual behavior. McPhee encouraged Allen to ask him questions as well. Allen answered some of the questions "despite being embarrassed and humiliated." She also tried to ignore or avoid answering the questions. Later that month, McPhee and Allen were playing golf when McPhee instructed Allen to say that she wanted to have sex with him. When she refused, McPhee stated, "I will get you to say it before it is all over with." On another golf outing in early September, McPhee placed Allen's hand on his groin area several times and made several sexual references. Each time, Allen moved her hand away from McPhee as quickly as she could.

On September 29, 2003, McPhee told Allen that he would no longer be "fooling around" with her and that he did not want to be wasting her time. He told Allen that he had sensed she had been "pulling away" from him. Allen responded that she enjoyed playing golf but that McPhee's conduct made her feel uncomfortable. The next day, McPhee told her that he felt bad about their conversation, that he had difficulty expressing himself, and that some people had trouble knowing when they had crossed the line.

On October 6, 2003, Allen filed a sexual harassment complaint against McPhee with the TBR. In a letter accompanying the complaint, Allen's attorney explained that the complaint was filed with the TBR rather than with the director because MTSU's anti-harassment policy did not provide a procedure to be followed when

the president is accused of harassment. Two days later, the TBR started an investigation led by Debbie G. Johnson ("Johnson"), the Assistant Vice Chancellor for Human Resources at the TBR. McPhee was told about the allegations and was instructed not to return to his office. Allen was placed on administrative leave with pay through October 17, 2003.

On October 15, 2003, McPhee issued his first press release. The press release acknowledged that a harassment complaint had been filed against him and stated that "[t]o even acknowledge these allegations with a denial would ... be contrary to the spirit of the mediation process." The press release also stated:

> I will say that I have not violated my wedding vows, that my wife and family are solidly behind me in this situation and that I have every hope and belief that this unfortunate situation can be resolved without permanent damage to me, my colleague or to the university.

Finally, this first press release stated, "I hope I will be given an opportunity to prove my innocence." On the following day, McPhee sent an email to the MTSU staff affirming that the complaint would not impact the day-to-day operations of the university, expressing gratitude for phone calls of support, and asking that the recipients focus on their work and on the university. The email also contained a copy of the first press release.

On October 17, 2003, counsel for the TBR told Allen's attorney that Allen should report to work on October 20, 2003, in the Development Office but with the same title, classification, and pay. Allen refused the assignment and said that she intended to report to work at the president's office. She was then told to remain on leave with pay.

On October 20, 2003, Allen re-filed her initial complaint of sexual harassment against McPhee,[2] in addition to complaints of retaliation and constructive discharge against McPhee, the TBR, and her immediate supervisor at MTSU. Allen asserted that McPhee's press release and email confirmed that he was the subject of the sexual harassment complaint and that being forced to either work in a new department or extend her leave of absence identified her as the complainant in violation of the confidentiality to be preserved by the process. She stated in part:

> I was very shocked when I realized the Board was releasing statements about the confidential sexual harassment complaint that I filed. I was already apprehensive about filing a complaint against Dr. McPhee because of his powerful position.... However, when I realized I could no longer handle the situation and that it was escalating, I knew I did not have a choice. I read the MTSU policy against sexual harassment and found some comfort in the fact that the policy states it protects the confidentiality of both parties and that information should only be revealed to the Respondent and to potential witnesses, and that information about me would only be shared with those who have a need to know about it.

In addition, Allen stated that Debbie Johnson had reassured her that the policy would be followed.

On October 20, 2003, McPhee filed a written response with the TBR denying that he sexually harassed Allen. McPhee stated that he "did not directly or indirectly request sexual favors" and "did not make sexual advances, verbal or physical." On October 28, 2003, McPhee filed a more detailed response. In this response,

---

**2.** Allen withdrew her original complaint due to a medical emergency experienced by

McPhee and the possibility of private resolution.

McPhee admitted playing golf with Allen, and he stated that they "occasionally celebrated good golf shots by hugging ... in a nonsexual manner." He otherwise denied touching or trying to kiss Allen. Although McPhee said that he danced with Allen in his office at her request, he denied that he ever touched her in an inappropriate or offensive manner. In addition, McPhee stated that Allen initiated and participated in discussions of a sexual nature and that Allen often hugged or touched him in public. McPhee stated that "no changes were made to [Allen's] job responsibilities." McPhee also alleged that Allen had openly expressed her desire to have sex with a married MTSU employee. In addition, McPhee alleged that he knew of at least two MTSU events at which Allen had too much to drink and danced in a sexually suggestive manner with other MTSU employees.

On November 25, 2003, Johnson submitted to the Chancellor of the TBR a report summarizing her findings and conclusions. Johnson found that there were no witnesses to the alleged incidents of harassment and no independent corroborating evidence to support or disprove Allen's allegations. Johnson found that no conduct by McPhee resulted in a tangible job detriment to Allen, such as a discharge, demotion, or reassignment. In addition, Johnson found that there was no change in Allen's title, job classification, salary, or benefits. However, Johnson found that McPhee created a hostile work environment by initiating golf games, hugging Allen on the golf course, engaging in explicit sexual conversations and innuendo, and dancing with Allen in his office on the weekend.

On December 5, 2003, Johnson's report and recommendations were accepted in full by the Chancellor of the TBR. As a result, McPhee was placed on leave without pay for twenty days, subjected to a $10,000 decrease in salary for one year, and required to participate in eight hours of sexual harassment training. McPhee was retained as President of MTSU, and Allen was transferred to the position of Coordinator in MTSU's Development Office where she would report directly to the Vice President for Development.

On December 18, 2003, McPhee issued his second press release acknowledging the investigation, accepting the recommendations and penalties, and apologizing for the distraction caused by the investigation. He acknowledged that he had engaged in inappropriate behavior but characterized the behavior as "a lapse in judgment by being alone with the complainant after work hours" and "put[ting] myself in a position where allegations of this nature could be made." The second press release also stressed that the investigation did not find that he had or had requested a sexual relationship with Allen. In January 2004, Dr. McPhee was interviewed by *Sidelines,* the MTSU student newspaper, in which he stated that a thorough investigation was conducted of the allegations against him and that he accepted the decision.

In February 2004, Allen filed this action for discrimination and retaliation in the Circuit Court for Rutherford County. The State and McPhee filed motions for summary judgment. The trial court considered the evidence outlined above and granted the motions for summary judgment. With regard to the discrimination claim, the trial court found that there had been no tangible employment action against Allen, that the State had used reasonable measures in preventing and correcting the sexual harassment, that Allen had failed to take advantage of the available preventive and corrective measures, and that McPhee was not individually liable. With regard to the retaliation claim,

the trial court found that neither the State nor McPhee had taken any materially adverse employment action against Allen.

The Court of Appeals affirmed the summary judgments. We granted Allen's application for permission to appeal.

## ANALYSIS

### I. Discrimination Claims

#### A. Liability of Employer for Hostile Work Environment Harassment

We begin our review with Allen's discrimination claim against the State. The THRA provides that it is a discriminatory practice for an employer to "[f]ail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin." Tenn.Code Ann. § 4–21–401(a)(1) (2005).[3] Our legislature intended for the THRA "to be coextensive with federal law." *Parker v. Warren County Util. Dist.*, 2 S.W.3d 170, 172 (Tenn.1999) (quoting *Carr v. United Parcel Serv.*, 955 S.W.2d 832, 834 (Tenn.1997)); *see also Bredesen v. Tenn. Judicial Selection Comm'n*, 214 S.W.3d 419, 430 (Tenn.2007). Although we are not bound or limited by federal law, "[t]he policy of interpreting the THRA coextensively with Title VII is predicated upon a desire to maintain continuity between state and federal law." *Parker*, 2 S.W.3d at 173; *see also Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn.1996). It is well settled that both the THRA and Title VII prohibit hostile work environment sexual harassment. *Campbell*, 919 S.W.2d at 31.

#### 1. Faragher/Ellerth and the Availability of the Affirmative Defense

The United States Supreme Court developed the modern framework for determining an employer's liability for hostile work environment sexual harassment in the companion cases of *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Those cases held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. There is, however, an important exception to the rule of vicarious liability:

> When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence.... The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. In accordance with the policy of maintain-

---

**3.** Similarly, Title VII of the Civil Rights Act of 1964 states, "[i]t shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (2003).

ing the continuity of the THRA and Title VII, we have since adopted the vicarious liability rule and the *Faragher/Ellerth* defense. *Parker*, 2 S.W.3d at 176. When the harassing supervisor has not taken or instigated a tangible employment action against the employee, such as a termination, failure to promote, demotion, or undesirable reassignment, the employer may raise an affirmative defense to liability. *Id.; Faragher*, 524 U.S. at 808, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765–66, 118 S.Ct. 2257. The affirmative defense requires the employer to establish: 1) that it took reasonable measures to prevent and correct discriminatory conduct; and 2) that the employee unreasonably failed to take advantage of these preventive and corrective measures. *Id.; see also Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257.

■ Allen argues that the *Faragher/Ellerth* defense is unavailable to the State because McPhee, the president of a state university, was the alter ego or proxy of the State. To support her position, Allen relies upon *Johnson v. West*, 218 F.3d 725 (7th Cir.2000). In *Johnson*, the Court of Appeals for the Seventh Circuit held that the affirmative defense is unavailable to an employer when "the harassing supervisor is ... 'indisputably within that class of an employer organization's officials who may be treated as the organization's proxy.'" 218 F.3d at 730 (quoting *Faragher*, 524 U.S. at 789, 118 S.Ct. 2275). Other federal circuits have applied similar reasoning. *See Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 384–85 (5th Cir.2003) (applying *Johnson*); *Mallinson–Montague v. Pocrnick*, 224 F.3d 1224, 1232–33 (10th Cir. 2000) (upholding a jury instruction stating that an employer may be held vicariously liable for the behavior of an individual acting as an alter ego of the employer); *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 516 (9th Cir.2000) (applying analogous reasoning to an employer's defense against punitive damages). Although we recognize that these federal circuits have interpreted *Faragher* and *Ellerth* in this fashion, we believe a careful reading of *Faragher* and *Ellerth* demonstrates that the United States Supreme Court did not intend to create an alter ego or proxy exception to the affirmative defense.

In *Johnson*, the Court of Appeals based the alter ego/proxy exception entirely on a single quotation from *Faragher*, thus creating the impression that the Court of Appeals believed it was simply restating the clear holding of that case. The quote that forms the basis the *Johnson* holding appears in the following context in the *Faragher* opinion:

> Nor was it exceptional that standards for binding the employer were not in issue in *Harris*, [510 U.S.17, 114 S.Ct. 367, 126 L.Ed.2d 295] *supra.* In that case of discrimination by hostile environment, the individual charged with creating the abusive atmosphere was the president of the corporate employer, who was *indisputably within that class of an employer organization's officials who may be treated as the organization's proxy.*

*Faragher*, 524 U.S. at 789, 118 S.Ct. 2275 (citation omitted) (second emphasis added). Viewing the italicized language in light of the sentence preceding it, it is apparent that the United States Supreme Court mentions the president's status as the organization's proxy only as an explanation for *Harris's* failure to set forth standards for determining employer liability. Moreover, the above-quoted language appears in the Court's summary of prior case law, over twenty paragraphs before the establishment of the affirmative defense that constitutes *Faragher's* central holding. *See Faragher*, 524 U.S. at 789–90, 807, 118

S.Ct. 2275. It is clear from this context that the quoted material is not intended to enunciate an exception to the *Faragher/Ellerth* affirmative defense.

Furthermore, nothing in the Supreme Court's explanation of the affirmative defense suggests that the availability of the defense depends on whether or not the supervisor is an alter ego or proxy for the employer. *Id.* at 807, 118 S.Ct. 2275; *Ackel*, 339 F.3d at 386–88 (Garza, J., concurring). Rather, the Supreme Court clearly states that the affirmative defense is available whenever "no tangible employment action is taken" against the employee. *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. Furthermore, the Supreme Court has continued to hold that *Faragher* and *Ellerth* created "*two* categories of hostile work environment claims: (1) harassment that 'culminates in a tangible employment action,' for which employers are strictly liable, and (2) harassment that takes place in the absence of a tangible employment action, to which employers may assert an affirmative defense." *Pa. State Police v. Suders*, 542 U.S. 129, 143, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004) (emphasis added) (citations omitted). We therefore remain unconvinced by the interpretation of Supreme Court precedent offered by *Johnson* and similar cases. Until the United States Supreme Court clearly articulates an alter ego or proxy exception, we decline to apply the *Johnson* court's reasoning to the THRA and hold that an employer may assert the *Faragher/Ellerth* affirmative defense regardless of whether the harassing supervisor is a proxy or alter ego of the employer.

Having determined that the State is not barred from asserting the affirmative defense by Allen's proxy/alter ego argument, we must now determine whether McPhee took or instigated a tangible employment action against Allen. If no such action was taken, the affirmative defense is available to the State. The record does not demonstrate that McPhee took or instigated any tangible employment action against Allen, nor does Allen contend that any such act was taken. We therefore hold that the State is entitled to assert the affirmative defense set forth in *Faragher/Ellerth*. We now turn to the issue of whether the undisputed facts establish the *Faragher/Ellerth* defense as a matter of law.

### 2. The Application of the Faragher/Ellerth Affirmative Defense

To avoid liability for sexual harassment committed by a supervisor an employer must prove: 1) that it took reasonable measures to prevent and correct discriminatory conduct; and 2) that the employee unreasonably failed to take advantage of these preventive and corrective measures. *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Parker*, 2 S.W.3d at 176. Under our summary judgment standards, the State is entitled to summary judgment only if the undisputed evidence, when viewed in the light most favorable to Allen, establishes that the State exercised reasonable care to prevent and correct the alleged sexual harassment and that Allen unreasonably failed to take advantage of the preventive and corrective measures. Tenn. R. Civ. P. 56.04; *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 88–89 (Tenn.2000).

### a. The Reasonableness of the State's Preventive and Corrective Measures

■ The first part of the *Faragher/Ellerth* affirmative defense requires us to examine both whether the employer exercised reasonable care to prevent sexual harassment and whether it exercised reasonable care to correct sexual harassment that had already occurred. We begin our

analysis with the requirement that an employer take reasonable measures to correct sexual harassment that has already occurred.

Federal case law indicates that the duty to correct sexual harassment requires an employer to take reasonable steps to end and investigate alleged harassment. *See, e.g., Weger v. City of Ladue*, 500 F.3d 710, 723–24 (8th Cir.2007); *Hill v. Am. Gen. Fin., Inc.*, 218 F.3d 639, 643 (7th Cir.2000); *Brown v. Perry*, 184 F.3d 388, 396–97 (4th Cir.1999). An employer is not required to conduct a proceeding in the nature of a trial to investigate allegations of sexual harassment. *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1304 (11th Cir.2007). Circumstances, however, may require an employer to conduct an "inquiry informally in a manner that will not unnecessarily disrupt the company's business, and in an effort to arrive at a reasonably fair estimate of truth." *Id.* Federal courts have found corrective measures inadequate primarily when the alleged harasser is not disciplined and harassment is allowed to continue. *See EEOC v. Harbert–Yeargin, Inc.*, 266 F.3d 498, 511 (6th Cir.2001); *Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 525 (5th Cir.2001).

Allen argues that the State failed to show that it reasonably corrected the sexually harassing behavior because the investigation was not thorough or impartial, McPhee's punishment was inadequate, and her position in the development office substantially differed from her position in the president's office. The record demonstrates that the investigation into Allen's sexual harassment complaint against McPhee was started on October 8, 2003,

only two days after she filed the complaint. As part of the investigation, Johnson sought to determine the veracity of Allen's allegations by conducting interviews with the parties and numerous witnesses. Although Johnson may not have taken all of the steps Allen requested, nor reached the conclusions Allen would have liked, there is no evidence that Johnson's efforts fell below the minimum requirements for a reasonable investigation.

McPhee was informed of the charges on October 9, 2003, and he was instructed not to return to his office. Allen was placed on paid administrative leave through October 17, 2003. To prevent further contact with McPhee, Allen was reassigned to work in the Development Office with the same job title, job classification, and salary. When Allen refused the temporary reassignment, she was allowed to remain on administrative leave with pay. After the investigation concluded, Johnson filed a detailed summary of her findings and recommendations. Chancellor Manning accepted and implemented the recommendations in full on December 5, 2003. McPhee was suspended for twenty days without pay, assessed a $10,000 reduction in annual salary for one year, and required to participate in eight hours of sexual harassment training. Allen was transferred to the Development Office in the position of coordinator. No further acts of sexual harassment occurred after she filed her complaint. Because it is clear from these facts that the State undertook an investigation to determine the truth of the accusations, disciplined McPhee,[4] and, most importantly, effectively ended the harassment, we conclude that the State's

4. Although we have held that disciplinary action taken against an alleged harasser is a relevant factor when determining the adequacy of an employer's corrective measures, this is not to say that an employer must necessarily discipline the alleged harasser to avoid liability. The application of this factor depends on the totality of the circumstances.

corrective actions were reasonable as a matter of law.

In addition to making reasonable efforts to correct harassment, employers must exercise reasonable care to prevent sexual harassment before it occurs. *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Parker*, 2 S.W.3d at 176. In *Parker*, we reversed the trial court's grant of summary judgment dismissing an employee's sexual harassment claim because the employer failed to prove that it exercised reasonable care to prevent sexual harassment. 2 S.W.3d at 177. Specifically, we held that summary judgment was inappropriate because the record was "devoid of evidence to support a finding that the [employer] exercised reasonable care to prevent the alleged sexual harassment" and because the employer "failed to either establish the presence of a written anti-discrimination policy that was properly disseminated to its employees or establish the presence of a policy suitable to deal with the employment circumstances of this case." *Id.* Our holding in *Parker* makes clear that the employer has the burden of establishing that it exercised reasonable care. *Parker* also demonstrates that the presence of a properly disseminated, written anti-harassment policy is relevant to the determination of whether an employer exercised reasonable care. *Id.*

Federal cases provide further guidance regarding an employer's duty to take reasonable steps to prevent harassment. It is widely accepted that the existence of an anti-harassment policy weighs heavily in favor of a conclusion that an employer has exercised reasonable care to prevent harassment. *See, e.g., Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir.1999), *overruled on other grounds by In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 42 (2d Cir.2006);

*Brown*, 184 F.3d at 395; *Shaw v. Auto-Zone, Inc.*, 180 F.3d 806, 811–12 (7th Cir. 1999); *Kohler v. Inter–Tel Techs.*, 244 F.3d 1167, 1180 (9th Cir.2001). The mere existence of an anti-harassment policy, however, does not conclusively establish that an employer has taken reasonable steps to prevent sexual harassment. *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 118 (3rd Cir.1999). On the contrary, an employer has the burden of establishing that anti-harassment policies are "reasonably designed and reasonably effectual." *Brown*, 184 F.3d at 396. An employer may meet this burden by demonstrating that its anti-harassment policy is reasonably published, contains reasonable complaint procedures, and is not otherwise defective. *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1314 (11th Cir. 2001).

Allen argues that the State failed to show that the anti-harassment policy was reasonably published. In support of her argument, Allen introduced evidence that several employees, including Allen's immediate supervisor, had received no training about MTSU's policy. She further argues that the inadequacy of dissemination of the policy is demonstrated by the fact that when she reported the harassment to Dr. Hannah, who had supervisory authority at MTSU, Dr. Hannah failed to report the harassment to the director as required by the anti-harassment policy. It is important to note, however, that the State is not required to demonstrate that its distribution efforts were perfect, but rather that the policy was reasonably published. *See Hill*, 218 F.3d at 644 (holding that employer was entitled to summary judgment where policy was kept in a "public access type place" where employees could access it). The record clearly shows that the State made the policy available to all employees online and

provided a hard copy of the policy to new hires. In addition, the State made efforts to inform employees of the contents of the policy through online training and speakers. Although there were longer-tenured employees who had never received a hard copy of the policy, no reasonable jury could conclude that MTSU's dissemination efforts were unreasonable. Accordingly, we hold that under these circumstances the State's dissemination efforts were reasonable as a matter of law.

 Allen also argues that the complaint procedures were unreasonable as applied to her because she was required to report the harassment to the director, who in turn was required to report to McPhee. In addition, the policy designated McPhee as the final decision-maker with regard to the resolution of the harassment. Generally, anti-harassment policies should set forth clear complaint procedures that permit an employer to bypass a harassing supervisor. *See Faragher*, 524 U.S. at 808, 118 S.Ct. 2275; *Shaw*, 180 F.3d at 812. The reasoning behind this principle is clear. Employees would be understandably reluctant to come forward with sexual harassment complaints if they were forced to seek assistance from their harassers. Complaining to a harassing supervisor could reasonably be expected to be futile and could potentially expose the complainant to an increased level of harassment. Employers have a duty to provide reasonable avenues for reporting sexual harassment and are therefore expected to design anti-harassment policies in such a way that employees are not put in this vulnerable position. *See Faragher*, 524 U.S. at 808, 118 S.Ct. 2275; *Shaw*, 180 F.3d at 812.

Although Allen was not required to report the harassment directly to McPhee, McPhee was the final arbiter regarding sexual harassment complaints. MTSU's policy failed to provide a method of remov-

ing McPhee from the decision-making process in situations in which he was the alleged harasser. Furthermore, Allen had no reason to suspect that MTSU would abandon the procedures set forth in its harassment policy and request the TBR to conduct the investigation and implement McPhee's punishment. Under these circumstances, Allen could have reasonably believed that complaining would have been futile or counterproductive. A reasonable jury therefore could conclude that the complaint procedures set forth in the policy were unreasonable as applied to Allen. Because there are genuine issues of material fact with regard to whether the State's anti-harassment policy contained reasonable complaint procedures, we hold that the State has failed to establish the first prong of the *Faragher/Ellerth* defense.

### b. The Reasonableness of Allen's Failure to Take Advantage of Preventive and Corrective Measures

 We now turn to the second prong of the *Faragher/Ellerth* affirmative defense, which required Allen to exercise reasonable care in avoiding harm by taking advantage of the State's preventive and corrective measures. In *Faragher*, the Supreme Court said that "while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a *demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.*" *Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275 (emphasis added). Furthermore, federal courts have consistently held an employee's duty to use an employer's complaint procedure promptly is not alleviated by the employee's speculative fear of retaliation or subjective belief in the futili-

ty of complaining. *Baldwin,* 480 F.3d at 1307; *Reed v. MBNA Mktg. Sys., Inc.,* 333 F.3d 27, 35–36 (1st Cir.2003); *Barrett v. Applied Radiant Energy Corp.,* 240 F.3d 262, 267–68 (4th Cir.2001); *Shaw,* 180 F.3d at 813. Rather, to be reasonable, an employee's failure to use an employer's complaint procedure must be based on a "credible fear" that any complaint would not be taken seriously or would result in retaliation. *Reed,* 333 F.3d at 36; *Caridad,* 191 F.3d at 295–96.

The record demonstrates that Allen waited nearly thirteen months after McPhee's first act of harassment to report the harassment. In the absence of proof that Allen's delay in reporting was based on a "credible fear" that her complaint would not be taken seriously or would result in retaliation, this evidence is sufficient to satisfy the State's burden of proof on the second prong of the *Faragher/Ellerth* defense. *Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275. Allen argues that her delay in reporting McPhee's conduct was reasonable because it stemmed from her concern that McPhee would learn of the allegations and be part of the decision-making process. As previously discussed, the sexual harassment policy required McPhee to be involved in the decision-making process for all sexual harassment complaints, with no exception made for complaints in which McPhee was the alleged harasser. Given the role McPhee would be designated to play in the handling of Allen's sexual harassment complaint, a reasonable jury could conclude that Allen could have *credibly* believed that complaining would have been futile or counterproductive or would have resulted in retaliation. Accordingly, we hold that there are material issues of fact regarding whether Allen unreasonably failed to take advantage of corrective measures made available to her by the State.

In summary, the State has failed to demonstrate that there are no genuine disputes of material fact with regard to the reasonableness of the anti-harassment policy's complaint procedures and the reasonableness of Allen's failure to take advantage of preventive and corrective measures made available by the State. Accordingly, the trial court erred in determining that the State established the *Faragher/Ellerth* defense.

### B. Liability of McPhee for Discrimination

The THRA states that "[i]t is a discriminatory practice for a person or for two (2) or more persons to ... (2)[a]id, abet, incite, compel or command a person to engage in any of the acts or practices declared discriminatory by this chapter." Tenn.Code Ann. § 4–21–301(2) (2005).

█ In applying this section, we have held that individual liability may exist under the common law civil liability theory of aiding and abetting. *See Carr v. United Parcel Serv.,* 955 S.W.2d 832, 836 (Tenn. 1997), *overruled on other grounds by Parker,* 2 S.W.3d at 176. The common law civil liability theory requires that "the defendant knew that his companions' conduct constituted a breach of duty, and that he gave substantial assistance or encouragement to them in their acts." *Id.* (quoting *Cecil v. Hardin,* 575 S.W.2d 268, 272 (Tenn.1978)). Accordingly, imposing accomplice liability for a supervisor in a hostile work environment claim requires evidence that the supervisor encouraged the employer to engage in employment-related discrimination or prevented the employer from taking corrective action. *Id.* at 836.

█ In the present case, McPhee denied most of Allen's allegations, but he did not try to inhibit or impair the investigation that was conducted by the TBR from October 8, 2003, through October 29, 2003.

In addition, McPhee did not discourage or prevent the State from taking remedial measures, as he accepted the sanctions that were imposed upon him.

Notwithstanding the evidence, Allen argues that we should adopt a new rule imposing individual liability based on a supervisor's personal participation in the actions that created the hostile work environment. Such a rule is inconsistent with *Carr* and the common law theory of aiding and abetting embraced in Tennessee Code Annotated section 4–21–301(2). As we said, "[a] supervisor ... may be individually liable for encouraging or preventing the employer from taking corrective action. Absent such allegations, [supervisor-defendants] [cannot] be held individually liable under a hostile work environment theory." *Carr*, 955 S.W.2d at 838. In sum, we decline to extend individual liability to supervisors who participate in the behavior creating the hostile work environment absent a showing that the supervisor's conduct encouraged the employer to engage in employment-related discrimination or prevented the employer from taking corrective action. Because the evidence did not satisfy this standard, we hold that the trial court properly granted summary judgment to McPhee on this issue.

## II. Retaliation Claims

We now turn to issues regarding Allen's retaliation claims. In relevant part, Tennessee Code Annotated section 4–21–301(1) provides as follows:

It is a discriminatory practice for a person or for two (2) or more persons to: (1) Retaliate or discriminate in any manner against a person because such person has opposed a practice declared discriminatory by this chapter or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under this chapter.

Tenn.Code Ann. § 4–21–301(1) (2005).

The standards by which a person or entity may be found liable for retaliation under Tennessee Code Annotated section 4–21–301(1) are issues of first impression for this Court. Our Court of Appeals has held that stating a prima facie case of retaliatory discharge requires an employee to prove: 1) that she engaged in a protected activity; 2) that the exercise of her protected civil rights was known to the defendant; 3) that the defendant thereafter took an employment action adverse to her; and 4) that there was a causal connection between the protected activity and the defendant's adverse employment action. *Miller v. City of Murfreesboro*, 122 S.W.3d 766, 775 (Tenn.Ct.App.2003). If an employee satisfies all four prongs, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. *Id.* at 776. If the employer articulates such a reason, the employee, who bears the burden of persuasion throughout the process, must present evidence demonstrating that the articulated reason is pretextual and that the employer's action was actually motivated by a desire to retaliate against the employee. *Id.* These four elements of a prima facie case and the burden shifting framework are identical to standards previously adopted in federal courts. *See Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990).

Since our intermediate appellate court first adopted the above requirements, the United States Supreme Court has significantly modified the third prong of the retaliation test. Specifically, the Court has clarified that an employer may be held liable for adverse actions that are not employment-related. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, ——, 126

S.Ct. 2405, 2414, 165 L.Ed.2d 345 (2006). In other words, an employee need not demonstrate that an employer took an *employment* action adverse to her. Any materially adverse action taken by the employer may satisfy the third prong of the retaliation analysis. *See id.* The United States Supreme Court further clarified that an employee is required to "show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 2415, 126 S.Ct. 2405 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C.Cir.2006)) (internal quotations omitted). The Court stressed that the standard is an objective one and that the materiality component "is important to separate significant from trivial harms." *Id.*

The United States Supreme Court's conclusion that a retaliatory action need not be work-related is based upon the statutory differences between discrimination and retaliation claims. Title VII's anti-discrimination provision makes it illegal for an employer "*to fail or refuse to hire or to discharge* any individual, or otherwise to discriminate against any individual *with respect to his compensation, terms, conditions, or privileges of employment*, because of such individual's race, color, religion, sex, or national origin." *Id.* at 2411, 126 S.Ct. 2405 (quoting 42 U.S.C. § 2000e–2(a)). Title VII's anti-retaliation provision, on the other hand, makes it unlawful for an employer "*to discriminate against* any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter." *Id.* (quoting 42 U.S.C. § 2000e–3(a)). The italicized portions of the anti-discrimination statute limit the provision's application to actions that "affect employment or alter the conditions of the workplace." *Id.* at 2412, 126 S.Ct. 2405. The retaliation provision, however, expresses no limitation upon the forms of discrimination that may give rise to a valid claim. *Id.* at 2412, 126 S.Ct. 2405. Accordingly, the United States Supreme Court concluded it is appropriate to hold employers liable for materially adverse actions that occur outside the scope of the employment. *See id.* at 2414, 126 S.Ct. 2405.

The language of the THRA compels the same conclusion concerning retaliation claims brought under the THRA. Tennessee Code Annotated section 4–21–301(1) provides that it is unlawful for an employer to "[r]etaliate or discriminate *in any manner* against a person because such person has opposed a practice declared discriminatory by this chapter." (emphasis added). Use of the phrase, "in any manner," makes it clear that employees are not required to demonstrate that the adverse action affects the employment. In light of the clear statutory language of the THRA and in furtherance of our policy of interpreting Tennessee law consistently with Title VII, we adopt the standard set forth in *White* for retaliation claims under the THRA. *See Parker*, 2 S.W.3d at 176.

▬▬ Applying *White*, we hold that in order to state a prima facie case for retaliation under the THRA an employee must demonstrate: 1) that she engaged in activity protected by the THRA; 2) that the exercise of her protected rights was known to the defendant; 3) that the defendant thereafter took a materially adverse action against her; and 4) there was a causal connection between the protected activity and the materially adverse action. The burden-shifting analysis that follows the establishment of a prima facie case remains unchanged by *White*. After an employee establishes a prima facie case of

retaliation, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the materially adverse action. *Miller*, 122 S.W.3d at 776; *see also Canitia*, 903 F.2d at 1066. If the defendant articulates such a reason, the employee, who bears the burden of persuasion throughout the process, must present evidence demonstrating that the articulated reason is pretextual and that the defendant's action was actually motivated by a desire to retaliate against the employee. *Miller*, 122 S.W.3d at 776; *see also Canitia*, 903 F.2d at 1066.

Having set forth the appropriate standards governing a retaliation claim, we now must apply those standards to the case before us. The first and second prongs of our retaliation test are clearly satisfied against both the State and McPhee. Allen clearly engaged in a protected activity by filing a sexual harassment complaint against McPhee. It is also clear that both the State and McPhee were aware of her exercise of this right. To survive a motion for summary judgment on her retaliation claims, Allen must allege facts that, if true, would allow a reasonable jury to find that the State and McPhee took materially adverse actions against Allen and that there was a causal connection between the protected activity and the materially adverse actions. *See Byrd v. Hall*, 847 S.W.2d 208, 214–15 (Tenn.1993).

### A. The State's Liability for Retaliation

 Allen argues that the State should be held vicariously liable for McPhee's allegedly retaliatory actions. Because Tennessee courts have not previously addressed the issue of an employer's vicarious liability for retaliation of a supervisor, Allen relies on *Morris v. Oldham County Fiscal Court*, 201 F.3d 784 (6th Cir.2000). In that case, the Court of Appeals for the Sixth Circuit observed that both the anti-discrimination and anti-retaliation provisions of Title VII prohibit discrimination by an employer. *Morris*, 201 F.3d at 791–92. Given the similarity of the prohibitions, the court reasoned that if severe and pervasive harassment by a supervisor constitutes discrimination under the anti-discrimination statute, then it should also be sufficient to constitute discrimination under the anti-retaliation statute. *Id.* Because *Faragher* and *Ellerth* held that an employer is vicariously liable for a supervisor's violation of the anti-discrimination statute, an employer should also be vicariously liable for similar conduct when it violates the anti-retaliation statute. *Id.* The court therefore held that an employer may be held vicariously liable when the retaliation takes the form of severe and pervasive harassment by a supervisor. *Id.* The First, Second, Fourth, Seventh, Ninth, and Tenth Circuits have reached similar conclusions. *Bryant v. Brownlee*, 265 F.Supp.2d 52, 67 (D.D.C. 2003) (observing that most circuits recognize that allegations of harassment or hostile work environment may form the basis of a retaliation claim against an employer). Finally, the *Morris* court concluded that the *Faragher/Ellerth* defense is available to employers who are exposed to vicarious liability for retaliatory harassment by a supervisor. *Morris*, 201 F.3d at 792. We now adopt the holding in *Morris* as a natural and reasonable extension of the principles set forth in *Faragher* and *Ellerth* and in furtherance of our policy of maintaining the continuity of the THRA and Title VII. *See Parker*, 2 S.W.3d at 176.

 Under the rule articulated in *Morris* the State will be held vicariously liable only if McPhee engaged in severe and pervasive retaliatory harassment. 201 F.3d at 791–92. As we have previously concluded, however, the harassment of Allen ended immediately after Allen filed her

complaint. Although Allen maintains that McPhee took a materially adverse action against her by issuing press releases and an email and by making false allegations against her, this conduct is not the type of severe and pervasive harassment that warrants a finding of retaliatory harassment. *See id.* at 790. *Morris* does not expose employers to liability for every materially adverse act by a supervisor, but only for those retaliatory acts that are severe and pervasive enough to also constitute harassment under the anti-discrimination provision. *See id.* at 791–92. Therefore, there is no evidence of retaliatory conduct by McPhee for which the State can be held vicariously liable. If the State is to be held liable for retaliation, it must be based on a materially adverse action taken directly by the State.

 Allen also argues that the State is directly liable for retaliation because it took a materially adverse action against her by transferring her to a position with less prestige and less responsibility after she filed her complaint for sexual harassment. In *White,* the Supreme Court held that a reassignment of duties can be deemed retaliatory even if both the former and present duties are within the same description. 126 S.Ct. at 2416. The Supreme Court explained that "[a]lmost every job category involves some responsibilities and duties that are less desirable than others" and that "[c]ommon sense suggests that one good way to discourage an employee ... from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable." *Id.* The Supreme Court further observed that "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position.'" *Id.* at 2417 (citation omitted).

Allen initially worked as an administrative assistant for McPhee, where her responsibilities included numerous special projects, supervising student workers, and other administrative tasks. She was transferred to MTSU's Development Office in the position of Coordinator. Although she received an increase in pay, Allen claims she no longer has a job description, has no supervisory responsibilities, has only clerical tasks, and has no opportunities for growth or promotion. Allen also claims that her new position lacks the responsibilities, exposure, and prestige that she had in the President's office. Viewing the evidence in the light most favorable to Allen, we conclude that a reasonable employee might have been dissuaded from filing a complaint if she knew that she would be reassigned from the President's office to Allen's current position. Accordingly, we conclude that there are genuine issues of material fact with regard to whether the State's reassignment of Allen was materially adverse.

 Turning to the fourth prong of our retaliation analysis, we must determine whether there was a causal connection between Allen's sexual harassment complaint and the State's decision to reassign Allen. To make the determination of whether a causal link exists courts consider whether an employer's conduct can be linked to retaliatory intent. *Jensen v. Potter,* 435 F.3d 444, 449 n. 2 (3rd Cir.2006), *overruled on other grounds by White,* 126 S.Ct. at 2414; *Treglia v. Town of Manlius,* 313 F.3d 713, 720 (2nd Cir.2002); *Goostree v. Tennessee,* 796 F.2d 854, 863 (6th Cir. 1986). Temporal proximity of the adverse action to the complaint, a pattern of antagonism following a complaint, or other circumstantial evidence supporting causation are all relevant to a determination of cau-

sation. *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279–81 (3rd Cir.2000). A majority of circuits have held that proof of close temporal proximity alone can establish causation, at least for purposes of stating a prima facie case. *McGowan v. City of Eufala,* 472 F.3d 736, 744 (10th Cir.2006); *Treglia,* 313 F.3d at 720; *Sweeney v. West,* 149 F.3d 550, 557 (7th Cir. 1998); *Swanson v. Gen. Servs. Admin.,* 110 F.3d 1180, 1188 (5th Cir.1997); *Fennell v. First Step Designs, Ltd.,* 83 F.3d 526, 535 (1st Cir.1996); *but see Michael v. Caterpillar Fin. Servs. Corp.,* 496 F.3d 584, 596 (6th Cir.2007). We adopt the majority rule and hold that close temporal proximity of a complaint and a materially adverse action are sufficient to establish a prima facie case of causation.

In this case, the TBR first attempted to reassign Allen two weeks after the filing of her complaint. When Allen declined to accept the reassignment, she was allowed to remain on paid leave while the TBR concluded its investigation. Allen was then officially reassigned when the TBR accepted the findings and recommendations of the investigation less than two months after Allen filed her complaint. These facts indicate a close temporal proximity of the complaint and the reassignment and therefore allow an inference that the TBR was motivated by an intent to retaliate. *See Jensen,* 435 F.3d at 450. This inference when combined with the evidence of a materially adverse action is sufficient to allow a reasonable jury to conclude that Allen has established a prima facie case of retaliation.

Although we have concluded that a reasonable jury could conclude that Allen has established a prima facie case, the State is entitled to summary judgment if it can articulate a legitimate, non-discriminatory reason for transferring Allen and if Allen is unable to present evidence that raises a genuine dispute over whether the proffered reason is pretextual. *See Young v. Dillon Cos.,* 468 F.3d 1243, 1249 (10th Cir.2006). To meet its obligation to articulate a legitimate, non-discriminatory reason for the reassignment, the State contends that it reassigned Allen to MTSU's Development Office to protect her from further harassment. Protecting employees from sexual harassment is clearly a legitimate and nondiscriminatory goal. Protecting employees is, in fact, one of the central purposes of the THRA. *See* Tenn. Code Ann. § 4–21–101(a)(1)–(4) (2005). By articulating a legitimate, non-discriminatory reason for the transfer, the State has presented Allen with the burden of producing evidence that the State's proffered motive is pretextual.

Allen can meet her burden by presenting evidence that: 1) the State's proffered reason has no basis in fact; 2) the proffered reason did not actually motivate the reassignment; or 3) the proffered reason is insufficient to explain the reassignment. *Carter v. Univ. of Toledo,* 349 F.3d 269, 274 (6th Cir.2003). Allen has failed to present such evidence. On the contrary, the evidence in the record supports the State's assertion that Allen was transferred to protect her from further harassment by McPhee. While a reasonable person could conclude that Allen has been assigned to a position that is less desirable than her previous position, her reassignment is clearly superior to the alternative of remaining in a position in which she would be forced to interact closely with her harasser. We therefore hold that Allen has failed to demonstrate the existence of a genuine issue of material fact regarding the State's motivation for the reassignment. Accordingly, we conclude that the State is entitled to summary judgment on this issue.

### B. McPhee's Liability for Retaliation

██ Allen argues that McPhee took an adverse employment action against her by issuing an email and two press releases that arguably portrayed McPhee as the victim of false accusations.[5] She asserts that these communications undermined her credibility and caused her to suffer a loss of reputation in the local community. Allen further argues that McPhee took an adverse employment action against her by making false accusations against her to Johnson, the TBR investigator.

The main text of the email merely affirmed that the complaint would not impact the day-to-day operations of the university, expressed gratitude for phone calls of support, and asked the employees and students of MTSU to focus on their work and on the university. We find nothing in the main text of this email that could reasonably be found to be materially adverse to Allen.

We now examine whether issuing the first and second press releases and circulating the first press release in the email to MTSU employees could be found to be materially adverse by a reasonable employee. Neither press release discloses Allen's identity or any information from which others could easily identify her. Furthermore, neither press release makes any affirmative allegations against Allen. Although both press releases imply that McPhee was being falsely accused of sexual harassment and were arguably intended to curry favor with the public, this alone is insufficient to support a finding that the press releases were materially adverse to Allen. We are unwilling to hold that a person accused of sexual harassment necessarily exposes himself to liability for re-taliation merely by asserting his innocence publicly. A reasonable employee would expect that a person accused of harassment will oppose the accusation. This is no less true of public figures who, as a result of their public status, will be expected to respond to the accusations publicly. While public figures do not have license to use their status to bully or embarrass their accuser, we hold that a reasonable employee would not be dissuaded from reporting discrimination based solely on the fact that the accused will publicly assert his innocence. Because the press releases are essentially limited to statements that imply McPhee's innocence, we conclude that the issuance of the press releases was not materially adverse to Allen.

██ Finally, we conclude that McPhee's allegations of inappropriate conduct by Allen were not materially adverse to her. In his written response to Allen's allegations, McPhee claimed that Allen initiated sexually explicit conversations, expressed a desire to have sex with a married MTSU employee, drank excessively at university events, and danced suggestively with MTSU employees. Although the statements were undoubtably intended to show Allen in a negative light, a reasonable employee would anticipate that a person accused of sexual harassment will oppose the allegation and perhaps make false statements about his accuser. Furthermore, it is highly relevant that McPhee's statements were made to Johnson in the context of a confidential investigation, rather than to other MTSU employees or the public at large. We cannot under these circumstances conclude that a reasonable employee would be dissuaded from filing a sexual harassment complaint by

**5.** For the first time in the proceedings, McPhee now argues that his statements were protected by the freedom of speech provisions in the United States and Tennessee Constitu-tions. We decline to address this issue given that the argument was not raised in the lower courts.

the fact that the accused will attempt to deny the allegation and discredit the accuser in the context of a confidential investigation. Accordingly, we hold that Allen has failed to present evidence satisfying the third prong of the retaliation test with regard to the email, press releases, and McPhee's statements to Johnson.

## CONCLUSION

We conclude that genuine issues of material fact exist regarding whether the State has established the *Faragher/Ellerth* defense. Accordingly, the State is not entitled to summary judgment on Allen's discrimination claim. We further conclude that Allen has failed to present any evidence that McPhee encouraged the State to engage in harassment or attempted to prevent the State from taking corrective action. Accordingly, McPhee is entitled to summary judgment on Allen's discrimination claim. We conclude that Allen succeeded in making a prima facie showing of retaliation with respect to the State, but has failed to present any evidence that the State's proffered reason for transferring her was pretextual. Accordingly, the State is entitled to summary judgment on Allen's retaliation claim. Finally, we conclude that Allen has failed to present evidence demonstrating that McPhee took an action materially adverse to her. Accordingly, McPhee is entitled to summary judgment on Allen's retaliation claim. We therefore affirm the trial court's judgments with respect to the discrimination claim against McPhee and the retaliation claims against the State and McPhee. We reverse the trial court's grant of summary judgment on the discrimination claim against the State and remand this case to the trial court for further proceedings.

1. Oral arguments in this matter were heard as part of the Court's CASE Project (Court of Appeals Affecting Student Education), on Feb-

Costs of this appeal are taxed equally to the appellee, the State of Tennessee, and the appellant, Tammie C. Allen, and her sureties for which execution may issue if necessary.